**In re Paul H. TITUS, Debtor.**

**Carlota M. Bohm, Trustee, Plaintiff,**

**v.**

**Paul H. Titus & Bonnie Titus, Defendants.**

**Carlota M. Bohm, Trustee, Movant,**

**v.**

**Paul H. Titus, Respondent.**

**TRZ Holdings II, Inc., Movant,**

**v.**

**Paul H. Titus, Respondent.**

**Paul H. Titus, Movant,**

**v.**

**TRZ Holdings II, Inc., Respondent.**

**Schnader Harrison Segal & Lewis, LLP, Movant,**

**v.**

**TRZ Holdings II, Inc., Respondent.**

**Bankruptcy No. 10–23668–TPA.
Adversary No. 10–2338–BM.**

United States Bankruptcy Court,
W.D. Pennsylvania.

Feb. 29, 2012.

John P. Vetica, Jr., Coraopolis, PA, for Robert Shearer, Trustee.

Neal H. Levin, Chicago, IL, for TRZ Holdings II, Inc.

Douglas A. Campbell, for Paul H. and Bonnie Titus.

Eric A. Schaffer, New York, NY, for Schnader Harrison Segal & Lewis, LLP.

## MEMORANDUM OPINION

**Related to Doc. Nos. 41, 45, 67, 108**

BERNARD MARKOVITZ, Bankruptcy Judge.

The opinion that follows is the second in a line of decisions rendered by the Court to deal with fraudulent transfer actions and related matters that have been brought against several preeminent members of the now-disbanded law firm of Titus & McConomy. The first such decision was handed down in *In re Arbogast,* 466 B.R. 287 (Bankr.W.D.Pa.2012). Much of the analysis contained in the following opinion mirrors that set forth in *Arbogast,* but, as one can see, there are significant differences between the two opinions.

### INTRODUCTION

Robert Shearer, the Chapter 7 Trustee (hereafter "the Trustee") for Paul Titus, the instant debtor (hereafter "the Debtor"), prosecutes the instant adversary proceeding (Adversary No. 10–2338–BM) so as to pursue a fraudulent transfer action against the Debtor and Bonnie Titus, his non-debtor spouse (hereafter "Mrs. Titus"). The fraudulent transfer action includes three counts and is pursued pursuant to Pennsylvania state fraudulent transfer law via 11 U.S.C. § 544(b)(1).

The Trustee and TRZ Holdings II, Inc. (hereafter "TRZ"), who is a pre-petition creditor of the Debtor, also object to many of the bankruptcy exemptions that the Debtor has taken. Such objections to exemptions are filed at Document No's. 41 and 45 in the main case docket (i.e., Bankruptcy No. 10–23668–TPA).

Shearer replaced Carlota Bohm as the Trustee after the instant adversary proceeding and the exemption objection filed at Doc. No. 41 were filed. Subsequent to such replacement, the captions for such

adversary proceeding and exemption objection were never amended. Consequently, Bohm is still listed in such captions as the Trustee, notwithstanding that Shearer is now the Trustee.

The instant opinion and accompanying order also dispose of objections that have been made by the Debtor and Schnader Harrison Segal & Lewis, LLP (hereafter "the Schnader Law Firm") to TRZ's claim against the Debtor (Doc. No's. 67 and 108 in the main case docket respectively). The Schnader Law Firm is a pre-petition creditor of the Debtor.

For the reasons set forth below, the Court will grant judgment in favor of the Trustee, and against the Debtor and Mrs. Titus jointly and severally, on the Trustee's fraudulent transfer action in the amount of $281,006.18. The Court will also sustain, in part, and overrule, in part, the exemption objections that have been made by the Trustee and TRZ. Finally, the Court will overrule the objections to TRZ's claim that have been made by the Debtor and the Schnader Law Firm.

### STATEMENT OF FACTS

The Debtor is an attorney who at one time was a partner at Titus and McConomy (hereafter "T & M"), a now-disbanded law partnership. In July 2000 Trizechahn Gateway, LLC (hereafter "Trizec"), who was the owner of the building in which T & M had rented space, filed a lawsuit against T & M in the Pennsylvania Court of Common Pleas for Allegheny County (hereafter "the Common Pleas Court"). Trizec filed such lawsuit on the basis that T & M had breached its lease agreement with Trizec (hereafter "the Lease Litigation"). Trizec named as defendants in the Lease Litigation approximately 20 individual partners of T & M including the Debtor.

On June 7, 2006, the Common Pleas Court entered judgment in the Lease Litigation in favor of Trizec, which judgment was jointly and severally entered against, *inter alia,* the Debtor. The amount of such judgment was for roughly $2.7 million, which amount is alleged to have subsequently grown to more than $3 million by virtue of interest and legal fees. The Lease Litigation judgment was subsequently appealed to the Pennsylvania Superior Court, which affirmed the Common Pleas Court's decision on July 3, 2007, as to most of the named defendants, including the Debtor.

In an attempt to collect on such judgment from the Debtor, Trizec commenced a fraudulent transfer action on April 23, 2007, against the Debtor and Mrs. Titus in the Common Pleas Court (hereafter "the Titus Fraudulent Transfer Action"). On May 20, 2010, the instant bankruptcy case was commenced by the filing of an involuntary bankruptcy petition. An order for relief was then entered in the instant bankruptcy case on May 28, 2010.

On June 3, 2010, the Debtor removed the Titus Fraudulent Transfer Action to this Court. Such removal served to initiate the instant adversary proceeding. On January 13, 2011, this Court entered an order that substituted the Trustee for Trizec as the plaintiff in the instant adversary proceeding, thereby placing such action in its present context.

TRZ, rather than Trizec, has filed an original and an amended proof of claim in the instant bankruptcy case, naming itself as the creditor to whom the Debtor owes the joint and several Lease Litigation judgment. TRZ claims that it is the entity to whom the Debtor owes such judgment on the basis that it is the successor in interest to Trizec. The basis for the objections to TRZ's claim by the Debtor and the Schnader Law Firm is that TRZ is not a successor in interest to Trizec and, thus, is

not the proper entity to whom the Debtor owes the joint and several Lease Litigation judgment. Until the Court addresses the two claim objections at the end of the instant opinion, the Court will (a) treat TRZ as being the proper creditor to whom the Debtor owes the joint and several Lease Litigation judgment, and (b) refer to TRZ and Trizec interchangeably (i.e., as being the same entity).

## STATEMENT OF THE CASE

The complaint that sets forth the Titus Fraudulent Transfer Action contains three counts. The first count pleads an actual fraudulent transfer action under Pennsylvania's version of the Uniform Fraudulent Transfer Act (i.e., 12 Pa.C.S.A. § 5104(a)(1)), and the latter two counts plead constructive fraudulent transfer actions under such statute (i.e., 12 Pa.C.S.A. §§ 5104(a)(2)(ii) and 5105).

12 Pa.C.S.A. § 5104(a)(1) & (2)(ii) provides, in pertinent part, that:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay or defraud any creditor of the debtor; or

(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

· · ·

(ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

12 Pa.C.S.A. § 5104(a)(1) & (2)(ii) (Purdon's 2011). 12 Pa.C.S.A. § 5105 provides that:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

12 Pa.C.S.A. § 5105 (Purdon's 2011).

The Trustee pursues the Titus Fraudulent Transfer Action pursuant to 11 U.S.C. § 544(b)(1). 11 U.S.C. § 544(b)(1) allows a bankruptcy trustee to "avoid any transfer of an interest of the debtor in property ... that is voidable under applicable [nonbankruptcy] law by a creditor holding an unsecured claim [against said debtor's bankruptcy estate]." 11 U.S.C.A. § 544(b)(1) (West 2011).

The gravamen of the Titus Fraudulent Transfer Action is that the Debtor engaged in fraudulent transfers when, subsequent to July 2000, he directed the Schnader Law Firm, which is where the Debtor has worked subsequent to the dissolution of T & M, to directly deposit his individual compensation that he solely earned therefrom into a checking account that he jointly owned with Mrs. Titus as tenants by the entirety (hereafter "the Entireties Checking Account"). The basis for such charge is (a) that, by virtue of the aforesaid direction regarding such deposits, the Debtor thereby transferred such compensation, and (b) that such transfers by the Debtor were fraudulent, either actually or constructively so, because they had the effect of shielding the Debtor's individual compensation from the reach of his creditors such as TRZ.

The Trustee pursues such alleged fraudulent transfers under 12 Pa.C.S.A. § 5104(a)(1) on the ground that the Debtor engaged in such transfers with actual intent to hinder, delay, or defraud his creditors, including TRZ. The Trustee pursues such alleged fraudulent transfers under 12 Pa.C.S.A. § 5104(a)(2)(ii) and 12 Pa.C.S.A. § 5105 on the ground that (a) the Debtor made such transfers without receiving reasonably equivalent value in return, and (b) he was either insolvent at the time of, or was rendered insolvent by, such transfers.[1]

As relief via the Titus Fraudulent Transfer Action, the Trustee seeks, pursuant to 11 U.S.C. § 550(a)(1), a judgment against both the Debtor and Mrs. Titus for the amount of the transfers to be avoided as fraudulent. 11 U.S.C. § 550(a)(1) provides, in pertinent part, that "to the extent that a transfer is avoided under section 544, ... the trustee may recover, for the benefit of the estate, the property transferred, or ... the value of such property, from ... the initial transferee of such transfer or the entity for whose benefit such transfer was made." 11 U.S.C.A. § 550(a)(1) (West 2011). The theory for such requested relief is that, because the Debtor transferred his individual compensation into the Entireties Checking Account, and since both the Debtor and Mrs. Titus jointly owned such account, the Debtor and Mrs. Titus both constitute initial transferees of such transfers (and thus the entities for whose benefit such transfers were made as well).

The Trustee relies on the decision in *In re Meinen*, 232 B.R. 827, 840–43 (Bankr. W.D.Pa.1999), and the cases cited therein for his position that the Debtor's periodic transfers of his solely-earned individual compensation into the Entireties Checking Account constitute constructive fraudulent transfers. The *Meinen* decision and the cases cited therein do indeed support the Trustee's position, provided that such deposited compensation, after its deposit into the Entireties Checking Account, was not utilized to satisfy reasonable and necessary household expenses for the maintenance of the Debtor's family. *See Id.* To the extent that such deposits were used to satisfy reasonable and necessary expenses for the maintenance of the Debtor's family, *Meinen*, with but one exception, would dictate a holding that such deposits do not constitute constructive fraudulent transfers. *See Id.* at 842–43. The exception just referred to is "those deposits in question which were then used ... to purchase other assets which are presently held as entireties property by" the Debtor and Mrs. Titus, *Id.* at 843; these latter deposits, under Meinen, would constitute constructive fraudulent transfers regardless of their necessity to the Debtor and Mrs. Titus, *see Id.*

The Court understands the Trustee to contend that the Debtor deposited at least $1,153,076.84 into the Entireties Checking Account between April 23, 2003, and June 30, 2010. The Court also understands the Trustee to attack as being fraudulent transfers $864,293.23 worth of such deposits, on the basis that such deposits funded the purchase of things that either were not necessities or are presently held as entireties property.

In response to the Titus Fraudulent Transfer Action, the Court understands

---

1. With respect to the "insolvency" component of the Trustee's constructive fraudulent transfer actions, he must prove under § 5105 that the Debtor was either insolvent at the time of, or was rendered insolvent by, the transfers in question. For his action under § 5104(a)(2)(ii), the Trustee must prove that the Debtor intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

the Debtor and Mrs. Titus to essentially contend that none of the direct deposits by the Schnader Law Firm into the Entireties Checking Account constitute fraudulent transfers pursuant to either § 5104(a)(1), § 5104(a)(2)(ii), or § 5105, and that even if they do, they are not recoverable from Mrs. Titus pursuant to § 550(a)(1). The Debtor and Mrs. Titus so contend because they argue (a) that, as a matter of law, what may be recovered from Mrs. Titus via § 550(a)(1) are such direct deposits which she utilized for luxury items above basic living expenses that directly benefitted her, and (b) that Mrs. Titus did not utilize any of such direct deposits to purchase luxury items above basic living expenses that directly benefitted her.

The genesis for such defense by the Debtor and Mrs. Titus is language contained in an April 2, 2009 Memorandum and Order of Court that was entered by the Common Pleas Court in the Titus Fraudulent Transfer Action prior to its removal to this Court. The Common Pleas Court, in such April 2, 2009 Memorandum and Order of Court, held that Trizec may recover from Mrs. Titus "only money defendant-wife [ (i.e., Mrs. Titus) ] used from the jointly held account into which the employer deposited defendant-husband's [ (i.e., the Debtor's) ] wages for luxury items above basic living expenses which directly benefitted her." It is this holding upon which the Debtor and Mrs. Titus rely for their defense in the instant matter.

The Common Pleas Court decision of April 2, 2009, in the Titus Fraudulent Transfer Action was preceded by another related decision by such court in the same action on May 29, 2008 (hereafter collectively "the State Court Titus Decisions"). This Court understands the Common Pleas Court in the State Court Titus Decisions to have held that (a) the direct deposits of the Debtor's individual compensation into the Entireties Checking Account only constitute fraudulent transfers to the extent that they were spent on luxuries, and (b) even to the extent that such deposits were spent on luxuries, thereby making them fraudulent transfers, they can only be recovered from Mrs. Titus if (i) she is the one who actually spent such deposits, and (ii) the luxury purchases actually benefitted her. By virtue of the latter of the two preceding holdings, the Common Pleas Court necessarily held that Mrs. Titus could not have been a transferee of deposits that constituted fraudulent transfers unless (a) she is the one who actually spent such deposits, and (b) the luxuries purchased with such deposits actually benefitted her.

In addition to the Titus Fraudulent Transfer Action, the Trustee and TRZ both object to many of the bankruptcy exemptions that the Debtor has taken. In particular, the Trustee and TRZ object to the Debtor's exemption of (a) what the Debtor characterizes in his Bankruptcy Schedule C as wages owed to him from his employer that he had earned but not yet been paid as of the commencement date of the instant bankruptcy case, (b) his interest in a life insurance policy with a cash surrender value of $220,000.00, (c) his retirement account valued at $1,549,795.00 as of the commencement of the instant case, and (d) his interests in various property that he owns with Mrs. Titus as tenants by the entirety.

As the Court understands it, the Trustee initially takes the position that the Debtor may not exempt his interests in the entireties property if, and to the extent that, the Trustee prevails in the Titus Fraudulent Transfer Action. The predicate for such position of the Trustee appears to be that if, and to the extent that, the Trustee so prevails, then such entireties property can

be executed upon to satisfy a judgment, thereby negating an exemption in such property.

The Trustee and TRZ also challenge the propriety of the statutory grounds that have been given by the Debtor for his exemption of his so-called unpaid wages, the cash surrender value of his interest in the life insurance policy, and his retirement account. Finally, the Trustee and TRZ appear to object to some portion of many of the Debtor's exemptions on the basis that certain of the additions to the assets sought to be exempted constitute fraudulent transfers; for example, the Trustee and TRZ appear to attack as being fraudulent transfers certain of the contributions that were made into the Debtor's retirement account.

## DISCUSSION

■ As an initial matter, the Court holds that the Trustee—to the extent that he seeks to do so—cannot, by way of the Titus Fraudulent Transfer Action, successfully attack as being fraudulent transfers any contributions that have been made into the Debtor's retirement account. The Court so holds because (a) the Trustee pursues as fraudulent transfers via the Titus Fraudulent Transfer Action only deposits that the Schnader Law Firm made of the Debtor's compensation directly into the Entireties Checking Account, and (b) the Court finds that all of the contributions that were made into the Debtor's retirement account were made directly into such account, that is none of such contributions first passed through the Entireties Checking Account.

Such holding by the Court, however, does not mean that the Trustee and TRZ cannot pursue the recovery of contributions that were made into the Debtor's retirement account via their objection to the Debtor's exemption of such retirement account. As set forth above, the Court suspects that the Trustee and TRZ base such exemption objection, in part, upon their position that certain of such retirement account contributions constitute fraudulent transfers, even if such transfers did not pass through the Entireties Checking Account. Therefore, that such retirement account contributions did not pass through the Entireties Checking Account, and thus cannot be pursued via the Titus Fraudulent Transfer Action, does not serve to negate any exemption objection that may have been lodged against them.

**I.** *The Titus Fraudulent Transfer Action.*

Numerous legal issues abound with respect to the Titus Fraudulent Transfer Action, including (a) whether the Trustee can pursue such action via § 544(b)(1), (b) the appropriate "lookback period" for such action, (c) what law should (or must) be applied to determine whether, and to what extent, the direct deposits of the Debtor's individual compensation into the Entireties Checking Account constitute fraudulent transfers, (d) whether the direct deposits of the Debtor's individual compensation into the Entireties Checking Account constitute transfers by the Debtor in the first instance, (e) whether Mrs. Titus constitutes an initial transferee of those deposits that are determined to constitute fraudulent transfers even if she did not spend such deposits and/or the deposits were not spent so as to benefit her, and (f) whether the Debtor was insolvent at the time of, or was rendered insolvent by, such direct deposits.

**A.** *The lookback period for the Titus Fraudulent Transfer Action and whether the Trustee can pursue such action.*

Fraudulent transfer actions under Pennsylvania's version of the Uniform Fraudu-

lent Transfer Act generally have a four-year statute of limitations as measured from the date that a transfer sought to be avoided was made. *See* 12 Pa.C.S.A. § 5109 (Purdon's 2011). Because Trizec commenced the Titus Fraudulent Transfer Action on April 23, 2007, Trizec appropriately thereby sought to avoid as being fraudulent those transfers that were made by the Debtor between April 23, 2003, and April 23, 2007.

Provided that Trizec held an unsecured claim against the Debtor on May 20, 2010 (i.e., the date when the instant bankruptcy case was commenced), the Trustee may, pursuant to § 544(b)(1), pursue any fraudulent transfer action that Trizec could have pursued on that date, such as— one would think—the Titus Fraudulent Transfer Action inclusive of such action's 4–year lookback period between April 23, 2003, and April 23, 2007. *See In re Andersen,* 166 B.R. 516, 523 (Bankr.D.Conn. 1994) ("if a creditor has a cause of action which is not time barred, the trustee's derivative action under § 544(b) is likewise not time barred"); *In re Hill,* 332 B.R. 835, 839 n. 3 (Bankr.M.D.Fla.2005) (same); *In re Moore,* 608 F.3d 253, 260–61 (5th Cir.2010) (same). Trizec, TRZ, or some entity that is or was affiliated with either or both of them indisputably held an outstanding unsecured claim against the Debtor on May 20, 2010, namely the joint and several judgment that emanates from the Lease Litigation which now approximates $3 million. Therefore, without more, the Court is compelled to hold that the Trustee may properly pursue the Titus Fraudulent Transfer Action inclusive of such action's 4–year lookback period between April 23, 2003, and April 23, 2007.

The Debtor and Mrs. Titus disagree that the Trustee may pursue a fraudulent transfer action against them that includes a 4–year lookback period from April 23, 2003, until April 23, 2007. Although they concede that the Trustee may bring a fraudulent transfer action against them, they appear to argue that the applicable lookback period should be the period from June 2, 2006, through July 1, 2010. Such position by the Debtor and Mrs. Titus is somewhat curious because (a) the period from June 2, 2006, through July 1, 2010, is longer than four years by approximately one month, and (b) the date of July 1, 2010, does not appear, at least to the Court, to bear any significance, not even to the May 20, 2010 commencement of the instant bankruptcy case were it the position of the Debtor and Mrs. Titus that the lookback period should be measured from that date. The Debtor and Mrs. Titus have not provided any explanation to the Court for their position.

The only rationale that the Court can discern that can even serve to provide a partial explanation for such position by the Debtor and Mrs. Titus is perhaps the argument upon which the Debtor bases his objection to TRZ's claim, namely that (a) TRZ is not really the entity to whom the Debtor is obligated on the joint and several Lease Litigation judgment, and (b) TRZ's claim should thus be disallowed. Such rationale is fallacious, however, because what matters for purposes of § 544(b)(1) in the instant matter is that a creditor existed as of May 20, 2010, that could have brought the Titus Fraudulent Transfer Action, not that TRZ in particular was such creditor. The Court does not even understand the Debtor (or, for that matter, the Schnader Law Firm) to argue that, as of May 20, 2010, no creditor existed that possessed the right to pursue the Titus Fraudulent Transfer Action; instead, the Court understands the Debtor and the Schnader Law Firm to quarrel with TRZ only over whether TRZ, in particular, is

the creditor that possesses the right to pursue such action.

Therefore, the Trustee is authorized, pursuant to § 544(b)(1), to pursue the Titus Fraudulent Transfer Action inclusive of such action's 4-year lookback period between April 23, 2003, and April 23, 2007.

■ The Court deems it appropriate to also discuss at this time the propriety of the Trustee's position that he may pursue, via the Titus Fraudulent Transfer Action, the avoidance of deposits that were made into the Entireties Checking Account between the dates of April 23, 2003, and June 30, 2010, notwithstanding that the lookback period for such action ends on April 23, 2007 (i.e., the date when such action was commenced in the Common Pleas Court). The Court rules that the Trustee, via the Titus Fraudulent Transfer Action, may not pursue as being fraudulent transfers any deposits that so occurred after April 23, 2007, and before June 30, 2010, because, as of April 23, 2007, which is when such action was commenced, such deposits could not even have constituted transfers, let alone fraudulent transfers. The Court so holds because (a) 12 Pa. C.S.A. § 5106(4) provides that "[a] transfer is not made until the debtor has acquired rights in the asset transferred," 12 Pa.C.S.A. § 5106(4) (Purdon's 2012), and (b) the Debtor, as of April 23, 2007, did not have any right to the wages that he earned after such date that were then subsequently deposited directly into the Entireties Checking Account.

**B.** *What case authority should be used to resolve the instant matter: the State Court Titus Decisions, the Meinen case, or something else?*

**(i)** *The propriety of the State Court Titus Decisions.*

As set forth above, the Debtor and Mrs. Titus maintain that the State Court Titus Decisions should control the resolution of the Titus Fraudulent Transfer Action. They contend that so applying such decisions compels the result that (a) the direct deposits of the Debtor's individual compensation into the Entireties Checking Account will only constitute fraudulent transfers to the extent that they were spent on luxuries, and (b) even to the extent that such deposits were spent on luxuries, Mrs. Titus cannot be deemed to have been a transferee of such deposits from whom a recovery can be had unless (i) she is the one who actually spent such deposits, and (ii) the luxury purchases actually benefitted her. This Court agrees that, if the State Court Titus Decisions control the resolution of the Titus Fraudulent Transfer Action, then the foregoing result advanced by the Debtor and Mrs. Titus is correct.

However, this Court respectfully disagrees with many of the basic rulings in the State Court Titus Decisions. For instance, this Court does not agree that the direct deposits of the Debtor's individual compensation into the Entireties Checking Account will only constitute fraudulent transfers to the extent that they were spent on luxuries. The Court concludes instead that such direct deposits may constitute fraudulent transfers, at least constructive fraudulent transfers, unless they were spent on necessities; that is, provided that such deposits were not spent on necessities, they may constitute constructive fraudulent transfers even if they were also not spent on luxuries.

The preceding holding by this Court is consistent with that of the court in *Meinen, see Meinen,* 232 B.R. at 842–43, which latter ruling the Court finds to be far more persuasive than the corresponding holding in the State Court Titus Decisions. The

*Meinen* holding is more persuasive to this Court than are the State Court Titus Decisions because the *Meinen* court relied exclusively on longstanding case authorities construing Pennsylvania law, *see Id.,* whereas the State Court Titus Decisions are not based on any case authority. The Court also so holds because it is simply not true, as the Common Pleas Court appeared to assume, that, if something is not a luxury, then it must be a necessity. Indeed, many items can fall in between the two categories. *See In re Alexo,* 436 B.R. 44, 49 (Bankr.N.D.Ohio 2010) (holding, within the context of 11 U.S.C. § 523(a)(2)(C), wherein a similar issue also arises, that "[a] medium between the two parameters [of necessities and luxuries] exists, where a transaction is neither fish nor fowl"); *In re Blackburn,* 68 B.R. 870, 874 (Bankr.N.D.Ind.1987) ("Certain goods may not qualify as necessities and [they] still [will] not be luxuries"); *In re Shaw,* 294 B.R. 652, 655 (Bankr.W.D.Pa.2003) (same, quoting *Blackburn* and citing *In re Stewart,* 91 B.R. 489, 497 (Bankr.S.D.Iowa 1988)). The only category that is relevant for fraudulent transfer purposes, consistent with Pennsylvania law, is that of necessities. *See Meinen,* 232 B.R. at 842–43. Therefore, whether something constitutes a luxury is irrelevant for fraudulent transfer purposes. Furthermore, if what a deposit is spent on falls in between the categories of necessities and luxuries, that is it is neither a necessity nor a luxury, then such deposit may constitute a constructive fraudulent transfer because it was not spent on a necessity.

This Court also does not agree that, with respect to those deposits in question that are determined to constitute avoidable fraudulent transfers, Mrs. Titus cannot be deemed to have been a transferee of such deposits from which a recovery can be had unless (a) she is the one who actually spent such deposits, and (b) that which was pur-

chased with such deposits actually benefitted her. The Court concludes instead that Mrs. Titus was a transferee, indeed an initial transferee along with the Debtor, of all of the direct deposits of the Debtor's individual compensation into the Entireties Checking Account, regardless of whether (a) she is the one who later spent such deposits, and (b) that which was purchased with such deposits actually benefitted her.

■ The preceding holding by the Court is ultimately dictated by binding Pennsylvania precedent, whereas the corresponding holding in the State Court Titus Decisions is not based on any existing authority. The binding Pennsylvania precedent to which this Court refers is the Pennsylvania Supreme Court decision in *In re Estate of Holmes,* 414 Pa. 403, 200 A.2d 745 (1964), wherein it was held, in pertinent part, that "[w]here ... an account is placed in the names of a husband and wife, a gift and the creation of an estate by the entireties is presumed even though the funds used ... to establish the account were exclusively those of the husband." *Id.* at 747; *see also Constitution Bank v. Olson,* 423 Pa.Super. 134, 620 A.2d 1146, 1149–50 (1993) (relying heavily on *Holmes* ); *In re Nam,* 257 B.R. 749, 761–62 (Bankr.E.D.Pa.2000) (relying on both *Holmes* and *Constitution Bank,* and holding that a joint bank account in the names of the debtor therein and his wife "is presumed to be *owned by ... [them]* as tenants by the entireties"). Because of such precedent as established in *Holmes,* money placed by one spouse in a joint bank account held in the names of both spouses is thereafter owned by each spouse as a tenant by the entirety, the statutory rule in 20 Pa.C.S.A. § 6303(a) notwithstanding. 20 Pa.C.S.A. § 6303(a) provides that "[a] joint account belongs, during the lifetime of all parties, to the parties in proportion to the net contributions by each to the sum

on deposit, *unless there is clear and convincing evidence of a different intent.*" 20 Pa.C.S.A. § 6303(a) (Purdon's 2011) (emphasis added). However, a spouse's act of placing money in a joint bank account held in the names of both spouses "constitutes such clear and convincing evidence of a different intent: the intent to create estates by the entireties, which arises as a presumption at law." *In re Estate of Cambest,* 756 A.2d 45, 53 (Pa.Super.Ct.2000) (citing *Constitution Bank*). Because Mrs. Titus owned all of the direct deposits of the Debtor's individual compensation that were made into the Entireties Checking Account the moment such deposits occurred, she was a transferee along with the Debtor (both as entireties tenants) of all of such deposits. *See In re Broadview Lumber Co., Inc.,* 168 B.R. 941, 962–63 (Bankr.W.D.Mo.1994);[2] *In re Computer Personalities Systems, Inc.,* 2002 WL 31988134 at 7 (Bankr.E.D.Pa. 2002); *In re Dawley,* 2005 WL 2077074 at 15 (Bankr.E.D.Pa.2005).

### (ii) *Whether the State Court Titus Decisions must be followed by this Court?*

■ Although this Court, as just set forth, takes issue with many of the basic rulings in the State Court Titus Decisions, is this Court nevertheless bound to adhere to such rulings when resolving the instant matter? The Court concludes that it is not so bound, and notwithstanding that Judge McCullough, the predecessor judge in the instant adversary proceeding, may perhaps have indicated his willingness to follow the State Court Titus Decisions when resolving the instant matter via interlocutory rulings that were rendered prior to trial. The Court identifies several reasons why it is not bound to adhere to the rulings in the State Court Titus Decisions when resolving the instant matter.

■ First, the State Court Titus Decisions cannot be accorded preclusive effect, be it by virtue of the doctrines of res judicata, collateral estoppel, or Rooker–Feldman, because such decisions (a) were rendered at the pre-trial stage before the Titus Fraudulent Transfer Action was removed to this Court, (b) did not completely resolve any, and most certainly did not completely resolve all, of Trizec's claims that are presently being pursued in such action, and (c) are thus clearly not final in nature.

■ Second, even if the State Court Titus Decisions could be accorded preclusive effect outside of bankruptcy by way of res judicata, collateral estoppel, or the Rooker–Feldman doctrine, such decisions nevertheless cannot operate to so preclude the Trustee from pursuing the Titus Fraudulent Transfer Action given that he was neither a party, nor in privity with a party, to such action when such decisions were rendered. *See In re Cowden,* 337 B.R. 512, 531 & 540–41 (Bankr.W.D.Pa. 2006) (citing *In re Marlar,* 252 B.R. 743, 757–58 (8th Cir. BAP 2000), and *In re Shuman,* 78 B.R. 254, 256 (9th Cir. BAP 1987), and holding that the Chapter 7 trustee therein was not precluded, either by way of res judicata, collateral estoppel, or

---

**2.** The spouse of the president of the debtor in *Broadview Lumber,* in contrast to Mrs. Titus, was held therein to be a mediate transferee of funds placed into a joint bank account by said president rather than an initial transferee of such funds. That is because said president was determined to be the initial transferee of such funds from the debtor in *Broadview*

*Lumber.* Such difference between *Broadview Lumber* and the instant matter, however, does not provide a point for distinction since such spouse in *Broadview Lumber* was nevertheless held to be a transferee therein because she owned the deposits made into the joint account therein from the moment such deposits occurred.

the Rooker–Feldman doctrine, from prosecuting a fraudulent conveyance action that was originally commenced outside of bankruptcy by a creditor because such trustee lacked privity with such creditor). The Court holds that the Trustee was, and is, not in privity with Trizec, who is the entity that he succeeded as plaintiff in the Titus Fraudulent Transfer Action, because (a) the Trustee represents not only the interests of Trizec, as an unsecured creditor in the instant bankruptcy case, but also the interests of the rest of the Debtor's creditor body,[3] (b) the rest of such creditor body was not in privity with Trizec, and (c) Trizec thus represented neither such creditor body nor, therefore, the Trustee at any time while the State Court Titus Decisions were being rendered in the Titus Fraudulent Transfer Action. *See Id.*

Third, the rulings in the State Court Titus Decisions do not constitute law of the district or anything like that because, quite simply, there is no such thing, especially with respect to interlocutory rulings like those rendered in the State Court Titus Decisions.

■■■ Fourth, even though the rulings in the State Court Titus Decisions constitute law of the case in the instant matter, the law of the case doctrine contains exceptions, one of which most notably is to correct glaring errors in the law. *See* 18B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure Jurisdiction* § 4478.1 (2nd ed. 2011) (pointing out that the law of the case doctrine does not prevent a trial court from reconsidering its own interlocutory rulings or the interlocutory rulings of a predecessor judge); *Schultz v. Onan Corp.*, 737 F.2d 339, 345 (3rd Cir.1984)

(noting that an exception to the law of the case doctrine applies if a prior decision is clearly erroneous and would work a manifest injustice, and holding that "[t]he doctrine is not a 'barrier to correction of judicial error' "). This Court holds, for the reasons already expressed above, that (a) the rulings in the State Court Titus Decisions are clearly erroneous, (b) such rulings would work a manifest injustice if they were to henceforth be applied in the instant matter, and (c) an application of the law of the case doctrine to the State Court Titus Decisions thus does not dictate that this Court must adhere to such decisions when resolving the instant matter.

■■■ Fifth, any interlocutory ruling that Judge McCullough may have made during the pre-trial phase of the instant adversary proceeding whereby he indicated his willingness to follow the rulings in the State Court Titus Decisions is also not entitled to preclusive effect at this time—via any of the doctrines of res judicata, collateral estoppel, or Rooker–Feldman—given that such rulings were necessarily interlocutory and, thus, not final in nature.

Sixth, even though any such interlocutory ruling by Judge McCullough, if one or more was made, can be considered to constitute law of the case, once again this Court need not follow such interlocutory ruling given, as set forth above, the exception to the law of the case doctrine to correct glaring errors.

### (iii) *The law to be followed henceforth in the instant adversary proceeding.*

The Court now decrees that, with but one exception to be noted shortly, it adopts

---

**3.** An examination of the Debtor's Bankruptcy Schedules D & F reveals that at least several unsecured creditors of the Debtor existed when the instant bankruptcy case was commenced other than those who have potential claims against the Debtor for indemnity or contribution arising out of the Lease Litigation.

as the law that will control the resolution of the instant matter the detailed legal principles as set forth in *Meinen* regarding the intersection of fraudulent transfer law in Pennsylvania (and, in particular, such law as set forth in Pennsylvania's version of the Uniform Fraudulent Transfer Act) and a debtor's deposit of his or her own funds into a bank account that is owned jointly with his or her spouse as tenants by the entireties. Therefore, and for all of the foregoing reasons as just set forth herein in the immediately preceding parts (i) and (ii), the Court respectfully will not follow the State Court Titus Decisions when resolving the instant matter, and notwithstanding that Judge McCullough may have indicated his willingness to follow them when resolving the instant matter via interlocutory rulings that were rendered prior to trial.

 Consistent with *Meinen,* the Court holds that the direct deposits of the Debtor's individual compensation into the Entireties Checking Account may constitute fraudulent transfers, at least constructive fraudulent transfers, unless they were spent on necessities. Therefore, it is irrelevant to the issue of whether such deposits constitute constructive fraudulent transfers that they were not spent on luxuries; that is, even if such deposits were not spent on luxuries, they may still constitute constructive fraudulent transfers if they were not spent on necessities. Consistent with *Meinen,* such direct deposits may also constitute constructive fraudulent transfers if they were used to purchase other assets which are presently held by the Debtor and Mrs. Titus as entireties property, regardless of whether such entireties property constitutes a necessity.

 The Court also holds that Mrs. Titus was an initial transferee along with the Debtor of all of the direct deposits of the Debtor's individual compensation into the Entireties Checking Account from the moment that such deposits occurred, regardless of whether (a) she is the one who later spent such deposits, and (b) that which was purchased with such deposits actually benefitted her. Therefore, to the extent that such deposits are determined to constitute fraudulent transfers, the Trustee, pursuant to § 550(a)(1), may recover the value of such transfers from either the Debtor or Mrs. Titus. What that means is that, by virtue of the Trustee's entitlement under § 550(a)(1) to so recover such value, he may obtain a joint and several money judgment against both the Debtor and Mrs. Titus in the amount of such value. *See Computer Personalities Systems,* 2002 WL 31988134 at 7 ("Having found that each Defendant is liable for the full amount of the Transfers, it is appropriate that joint and several liability should attach for $155,000"); *Dawley,* 2005 WL 2077074 at 15 (imposing a judgment against Mrs. Dawley severally that will reach her individual assets to remedy a transfer of property that was made by Mr. Dawley to both of them as tenants by the entirety). Such money judgment, of course, may be satisfied either from (a) entireties property that the Debtor and Mrs. Titus own, (b) property that is individually owned by the Debtor, and/or (c) property that is individually owned by Mrs. Titus.

 With respect to a recovery from the Debtor at this time, the Court is fully aware that the Debtor has already received his Chapter 7 discharge and that, by virtue of such discharge and 11 U.S.C. § 524, recovery may no longer be had against the Debtor on any pre-petition claim against him. However, because the Trustee is prosecuting the instant matter, that is the Titus Fraudulent Transfer Action, post-petition pursuant to § 544(b)(1), such lawsuit has, as of the commencement

of the instant bankruptcy case, been transformed into a bankruptcy cause of action. Bankruptcy causes of action, because they can only be brought post-petition, are necessarily then not pre-petition claims. The relevance of these preceding points to the present discussion is that the Debtor's Chapter 7 discharge will not operate to discharge him from any liability that might now be imposed upon him within the context of the Titus Fraudulent Transfer Action. Consequently, the Debtor's Chapter 7 discharge and § 524 will not operate to bar the entry of a money judgment against the Debtor at this time via § 550(a)(1) within the context of the instant matter. *See In re Loomer,* 198 B.R. 755, 758 (Bankr.D.Neb.1996) (post-petition recovery can be had against debtors in bankruptcy on bankruptcy causes of action pursuant to § 550(a)(1)).

Finally, the Court has examined both the original complaint that served to commence the Titus Fraudulent Transfer Action and the second amended complaint that was filed in the Common Pleas Court in response to the first of the two State Court Titus Decisions. Both complaints appear to be practically identical except for a paragraph—¶ 15 in the second amended complaint—that has been inserted into the first count of the second amended complaint, which count sets forth an actual fraudulent transfer action under § 5104(a)(1). The second and third counts of the original complaint, which counts set forth constructive fraudulent transfer actions under §§ 5104(a)(2)(ii) and 5105, have been left intact in the second amended complaint. The Court observes that the second and third counts of the second amended complaint are completely independent of the first count therein, that is the viability of such second and third counts does not in any way depend upon either such first count's success or the establishment of any of the allegations that

have been made in such first count. The Court notes that the substance of what is pled in the second and third counts of the second amended complaint, that is the constructive fraudulent transfer actions under §§ 5104(a)(2)(ii) and 5105 that are set forth therein, are consistent with this Court's foregoing statement of the law that is to be utilized henceforth to resolve such constructive fraudulent transfer actions. Because of the foregoing points that have been made in the instant paragraph, and since, as set forth above, the State Court Titus Decisions are not binding on this Court as it resolves the instant matter, the Court does not identify any due process concerns in henceforth applying the law as has been elucidated in prior paragraphs herein to resolve such matter.

### (iv) *Burden of proof.*

As set forth above, this Court identifies one aspect of the *Meinen* decision that it cannot follow when resolving the instant matter. Such aspect regards the placement of the burden of proof with respect to whether a debtor's deposits of his or her own funds into an entireties bank account were (a) used to satisfy necessities, and/or (b) spent on other assets that are presently owned as entireties property.

*Meinen* imposes on constructive fraudulent transfer action defendants the burden of proving that such bank deposits were used to satisfy necessities and were not spent on other assets that are presently held as entireties property, failing which such deposits may be classified as constructive fraudulent transfers. *See Meinen,* 232 B.R. at 843. *Meinen* imposes such burden of proof on constructive fraudulent transfer action defendants because the *Meinen* court operated under the presumption that such defendants' use of such bank deposits to satisfy necessities consti-

tutes an affirmative defense of such defendants. *See Id.* at 842.

■■ After considering Committee Comment 6 to 12 Pa.C.S.A. § 5102 and case authority that discusses the import of such comment, this Court holds, albeit somewhat reluctantly, that Pennsylvania's version of the Uniform Fraudulent Transfer Act imposes on a constructive fraudulent transfer action plaintiff the burden of proving—as part of its prima facie case that reasonably equivalent value was not returned—that relevant bank deposits either were not used to satisfy necessities or were spent on other assets that are presently held as entireties property. *See* 12 Pa.C.S.A. § 5102, Committee Cmt. 6 (1993); *Fidelity Bond and Mortgage Co. v. Brand,* 371 B.R. 708, 716–21 (E.D.Pa. 2007); *Castle Cheese, Inc. v. MS Produce, Inc.,* 2008 WL 4372856 at 22–24 (W.D.Pa. 2008). Therefore, the Trustee, in order to prevail on his constructive fraudulent transfer counts in the instant matter, must preponderantly prove that the direct deposits of the Debtor's compensation into the Entireties Checking Account either (a) were not used to satisfy necessities, or (b) were spent on other assets that are presently held as entireties property.

■■ That being said, the Court can and will impose on constructive fraudulent transfer defendants, herein the Debtor and Mrs. Titus, the burden of producing at least some useful evidence regarding what the funds deposited into an entireties bank account are ultimately spent on; the precision regarding such evidence will necessarily vary depending upon the circumstances. Shifting the burden of producing evidence is not the same thing as shifting the burden of persuasion (i.e., the ultimate burden of proof), thus does not run afoul in any way of the authorities just cited that discuss the aforesaid Committee Comment 6, and is appropriate given that constructive fraudulent transfer defendants will often possess complete control over information as to the ultimate use of bank deposits.

### C. Other threshold issues to be resolved.

### (i) What is a necessity?

Much contention between the parties has been generated by the issue of what constitutes a necessity or, put more accurately, a reasonable and necessary household expense of a debtor. The Debtor and Mrs. Titus maintain that, for fraudulent transfer law purposes in Pennsylvania, the term "necessities" and the phrase "reasonable and necessary household expenses of a debtor" are to be equated with the term "necessaries" as that term is used within both Pennsylvania's common law doctrine of "necessaries" and 23 Pa.C.S.A. § 4102, which statutory provision essentially codifies the foregoing doctrine of "necessaries."

■■ "The doctrine of necessaries is a judicially created doctrine that invokes liability on a spouse for the goods provided to the other spouse or the family despite the absence of any express written consent." 21 *Standard Pennsylvania Practice* 2d § 116:16 (2011).

> It is now provided by statute [ (i.e., § 4102) ] that in all cases where debts are contracted for necessaries by either spouse for the support and maintenance of the family, it is lawful for the creditor to institute suit against the husband and wife for the price of such necessaries and, after obtaining a judgment, have an execution against the contracting spouse alone. If no property of that spouse is found, execution may be levied on and satisfied out of the separate property of the other spouse.

*Id.* It has been held that

> [t]he scope of 'necessaries' for purposes of this provision [ (i.e., § 4102) ] is

not restricted to what may be considered the bare essentials required to hold body and soul together. Things required for and suitable in light of the rank and position of the spouses to maintain their lifestyle are also included. The kind and amount of such necessaries is to be determined on a case-by-case basis by considering the means, ability, social position and circumstances of both spouses.

*In re Olexa,* 317 B.R. 290, 294 (Bankr. W.D.Pa.2004) (citing *Gimbel Brothers, Inc. v. Pinto,* 188 Pa.Super. 72, 145 A.2d 865, 869 (1958)).

 The Debtor and Mrs. Titus contend, consistent with the foregoing law, that, for Pennsylvania fraudulent transfer law purposes, an expenditure constitutes a necessity if, in light of the rank and position of a judgment debtor and his or her spouse, such expenditure is necessary to maintain the lifestyle that they enjoyed prior to the emergence of a creditor claim (or, perhaps more appropriately, prior to the beginning of a fraudulent transfer lookback period). Put differently, according to the Debtor and Mrs. Titus, whether an expenditure constitutes a necessity or not, for fraudulent transfer law purposes, must be determined by comparing the lifestyle of a judgment debtor and his or her spouse prior to and after the beginning of a fraudulent transfer lookback period; only if such expenditure had the effect of improving such lifestyle would such expenditure not constitute a necessity. For several reasons, the Court rejects such position of the Debtor and Mrs. Titus.

First, the *Olexa* decision, and *Gimbel Brothers* upon which *Olexa* relies, are not fraudulent transfer cases. Therefore, they cannot properly be cited as supportive of the proposition that the Debtor and Mrs. Titus advance, namely that what constitutes a necessity for fraudulent transfer purposes is the same as what constitutes a necessary within the doctrine of necessaries. Second, the Court is unaware of the existence of any other Pennsylvania case authority—the *Meinen* decision and the cases cited therein included—that would support the position of the Debtor and Mrs. Titus.

Third, the Court is aware of cases in other jurisdictions that have dealt with precisely the issue just raised, and they all appear to reject the position of the Debtor and Mrs. Titus, that is they decline to hold that what constitutes a necessity for fraudulent transfer purposes is the same as what constitutes a necessary within the doctrine of necessaries. *See Cruickshank–Wallace v. County Banking and Trust Co.,* 165 Md.App. 300, 885 A.2d 403, 424 (2005) (holding, even after the common law doctrine of necessaries had been abolished in Maryland, that the husband therein did not receive fair consideration from the wife therein for constructive fraudulent transfer purposes even if said wife used the money that said husband transferred into her bank account for necessaries), *abrogated by Wal Mart Stores, Inc. v. Holmes,* 416 Md. 346, 7 A.3d 13 (2010) (abrogating out of what appears to be an abundance of caution, see discussion at 31–32); *United States v. Mazzeo,* 306 F.Supp.2d 294, 309–10 (E.D.N.Y.2004) (same), *vacated as moot,* 2004 WL 3079366.

Fourth, the Court chooses to reject the position of the Debtor and Mrs. Titus regarding what constitutes a necessity because to do otherwise, that is to determine what is a necessity for fraudulent transfer purposes by using a sliding scale standard that is tailored to the preexisting lifestyle of a judgment debtor and his or her spouse, will allow such judgment debtor to avoid too easily the reach of, that is to essentially abuse, fraudulent transfer laws. Indeed, the Debtor and Mrs. Titus rely

upon the *Gimbel Brothers* decision to support their position that a necessity is to be determined by resort to the caselaw regarding the doctrine of necessaries, yet in *Gimbel Brothers* it was determined that a mink coat constituted a necessary! Sanctioning the use of a standard that could compel a result similar to that which was reached in *Gimbel Brothers* within the context of fraudulent transfer law, this Court holds, is simply something that is too perverse to consider when undertaking to decide whether something constitutes a necessity.

Having decided that a necessity for fraudulent transfer purposes is not to be equated with what constitutes a necessary within the doctrine of necessaries, can the Court offer any guidance as to what is a necessity? The Court finds that little guidance really can be offered as to the meaning of such term. The Court will certainly apply the dictionary definition of the term "necessity." As well, the Court repeats the point, already made earlier herein wherein the Court relied upon case authorities regarding § 523(a)(2)(C), that just because an expenditure does not constitute a luxury, that does not necessarily mean that such expenditure will constitute a necessity; put differently, many expenditures will fall between the extremes of necessity and luxury and, if such expenditures fall somewhere in between such extremes, *they will not constitute a necessity.* Finally, the Court, when endeavoring to ascertain whether an expenditure constitutes a necessity, believes that it is inappropriate to consider the rank and social position of a judgment debtor and his or her spouse—i.e., such decision should not be made by utilizing a sliding scale standard predicated on the preexisting lifestyle of such judgment debtor and his or her spouse. Instead, factors that are fair game for a court to consider when making a determination regarding whether something constitutes a necessity would include the number of people in such judgment debtor's household, any adverse medical condition of a household member, and the cost of living in the general geographic area where such debtor resides.

### (ii) *Whether the direct deposits constitute transfers by the Debtor in the first instance?*

12 Pa.C.S.A. §§ 5104(a) and 5105 both require, before a transfer can be avoided as fraudulent thereunder, that such transfer have been made by the debtor. Therefore, another threshold issue that must be resolved in the instant matter is whether the direct deposits of the Debtor's individual compensation into the Entireties Checking Account constitute transfers that were made by the Debtor. The Debtor and Mrs. Titus predictably argue that such direct deposits do not constitute transfers that were made by the Debtor, while the Trustee contends otherwise.

Pennsylvania's version of the Uniform Fraudulent Transfer Act defines a "transfer," in pertinent part, as "[e]very mode, direct or indirect, . . . of disposing of or parting with an asset or an interest in an asset." 12 Pa.C.S.A. § 5101(b) (Purdon's 2011). Not included as an asset, however, is (a) "property to the extent [that] it is generally exempt under nonbankruptcy law," and (b) entireties property "to the extent [that] it is not subject to process by a creditor holding a claim against only one tenant." *Id.* 42 Pa.C.S.A. § 8127(a) provides generally that "[t]he wages, salaries and commissions of individuals shall while in the hands of the employer be exempt from any attachment, execution or other process." 42 Pa.C.S.A. § 8127(a) (Purdon's 2011).

Because of the foregoing statutory provisions, and since the Schnader Law Firm

deposited the Debtor's salary[4] directly into the Entireties Checking Account rather than physically place such salary into the Debtor's hands so that he could then physically deposit the same into such bank account himself, the Debtor and Mrs. Titus make what the Court understands to be several discrete arguments. First, they argue that the Debtor's wages were never transferred by anyone, let alone the Debtor, within the meaning of § 5101(b) and for purposes of §§ 5104(a) and 5105, because such wages were exempt in the hands of the Schnader Law Firm and, thus, such wages never constituted an asset of the Debtor. Second, they perhaps contend that, even if the Debtor's wages were somehow so transferred, they were nevertheless transferred by the Schnader Law Firm rather than the Debtor since they were never physically placed into the Debtor's hands.

The foregoing arguments, the Court concludes, fail (a) because, the Court holds in turn, the direct deposits constitute indirect transfers by the Debtor himself of his salary into the Entireties Checking Account, and (b) given the language of § 5101(b), which statutory provision expressly provides that indirect transfers, or indirect modes of disposing of or parting with an asset, constitute transfers for purposes of §§ 5104(a) and 5105, see In re Craig, 144 F.3d 587, 592 (8th Cir.1998) (applying North Dakota's version of the Uniform Fraudulent Transfer Act, which does not differ in any relevant respect from Pennsylvania's version, and holding that such act "defines transfer to include both 'direct and indirect' modes of parting with an asset or interest in an asset"); In re FBN Food Services, Inc., 185 B.R. 265,

272 (N.D.Ill.1995) (applying the Bankruptcy Code fraudulent transfer provisions at 11 U.S.C. §§ 548(a) and 101(54), which are both similarly worded to and similarly construed with the relevant UFTA provisions at issue herein, and holding that " 'a transfer does not have to be made directly by a debtor' in order to fall within the ambit of the statute"); In re 1634 Associates, 157 B.R. 231, 234 (Bankr.S.D.N.Y.1993) (same, applying the Bankruptcy Code fraudulent transfer provisions at 11 U.S.C. §§ 548(b) and 101(54), and holding as well that "[h]istorically, the term 'transfer' has been granted a broad interpretation").

 Because the Debtor so indirectly transferred his wages, each such indirect transfer is properly viewed, that is it must be recast, as two discrete transfers, namely a transfer by the Schnader Law Firm of such wages physically into the Debtor's hands, and then a transfer physically by the Debtor of such wages into the Entireties Checking Account. See Craig, 144 F.3d at 592 (quoting Merriam v. Venida Blouse Corp., 23 F.Supp. 659, 661 (S.D.N.Y.1938), which recast an indirect transfer by a debtor as two discrete transfers, the first of which was from a corporation to the debtor and the second of which was from the debtor to his wife and daughter; also quoting Merriam to the effect that " '[a] person may not do by indirection what he is forbidden to do directly' "); see also 1634 Associates, 157 B.R. at 234 (holding that "the spirit of § 548(b) [would] be violated if a general partner was permitted to transfer indirectly what it could not transfer directly"). Since such direct deposit transactions, as so recast, have the effect of placing the Debtor's wages physically into his hands,[5] and given that such

4. For purposes of resolving the Titus Fraudulent Transfer Action, the Court will presume that what the Debtor received from the

Schnader Law Firm in the form of compensation constituted wages or salary.

5. Essentially because indirect transfers are recast as such, "[t]he Uniform Fraudulent

wages are not exempt while they rest in his hands, *see* 42 Pa.C.S.A. § 8127(a) (in Pennsylvania, wages are exempt only while they are in the hands of the employer); *In re Bosack*, 454 B.R. 625, 633 (Bankr. W.D.Pa.2011) (construing § 8127(a) similarly by virtue of such statutory provision's express terms), such wages constitute an asset within the meaning of § 5101(b) that can then be the subject of a transfer by

him, also within the meaning of § 5101(b) and for purposes of §§ 5104(a) and 5105.

Therefore, the direct deposits of the Debtor's individual compensation into the Entireties Checking Account constitute transfers that the Debtor made himself for purposes of §§ 5104(a) and 5105, notwithstanding that the Debtor made such transfers indirectly.[6]

Transfer Act ... does not require that the debtor physically possess the asset" that such debtor is deemed to have indirectly transferred. *Craig*, 144 F.3d at 593; *see also FBN Food Services*, 185 B.R. at 273 (same).

**6.** The Court is aware of a couple of decisions from jurisdictions other than Pennsylvania that have been cited, either by the Debtor and Mrs. Titus or by similarly situated parties in other adversary proceedings that are presently pending before this Court, in support of the position that deposits of wages by an employer directly into an employee's bank account that is held by such employee as a tenant by the entirety do not constitute transfers for purposes of §§ 5104(a) and 5105. Those decisions are *Daugherty v. Central Trust Co. of Northeastern* Ohio, N.A., 28 Ohio St.3d 441, 504 N.E.2d 1100 (1986), and *Goebel v. Brandley*, 174 S.W.3d 359 (Tex.App.2005). Such decisions, as a threshold matter, are, of course, not binding on this Court. The Court also finds, as explained below, that both such decisions are distinguishable from the instant matter involving the Debtor and Mrs. Titus.

The *Daugherty* court held that, in Ohio, "personal earnings exempt from execution [while in the possession of an employer] ... retain their exempt status when deposited in a personal checking account, so long as the source of the exempt funds is known or reasonably traceable." *Daugherty*, 504 N.E.2d at 1103. An undoubtable corollary of such decision in *Daugherty* is that wages, to the extent that they are traceable as such, remain exempt in Ohio while merely in the hands of an employee, either before deposit into a bank account or regardless of any such future deposit. Such result in Ohio is at odds with the law, that is it would not occur, in Pennsylvania because, as set forth earlier herein, in Pennsylvania wages are exempt only while they are in the hands of the employer. Therefore, that a transfer of wages by an employee

in Ohio, either directly or indirectly, might not constitute a transfer for purposes of the Uniform Fraudulent Transfer Act in Ohio does not compel a similar result in Pennsylvania for purposes of Pennsylvania's version of such law.

*Goebel* involved indirect transfers of wages by an employee in Texas for the purchase of savings bonds for her children. In Texas, as in Ohio and Pennsylvania, wages are exempt while in the hands of an employer. *See Goebel*, 174 S.W.3d at 363–64. The *Goebel* court ultimately held that the indirect transfers at issue therein did not constitute transfers for purposes of Texas' Uniform Fraudulent Transfer Act. *See Id.* at 366. In the process of so holding, the *Goebel* court pointed out (a) that, after the amendment in 1989 of a Texas statute, proceeds of, or disbursements from, exempt property in Texas essentially retain the exempt status of such property in Texas, presumably if such proceeds or disbursements can properly be traced, and (b) that wages in Texas, therefore, upon their receipt by an employee do not lose their status as exempt. *See Id.* at 364–65. That being the case, an employee's transfer of such wages, either directly or indirectly, cannot constitute a transfer for purposes of Texas' Uniform Fraudulent Transfer Act. *See Id.* at 366. Such result in Texas is very similar to that which is reached in Ohio. Unfortunately for the Debtor and Mrs. Titus, as well as those other litigants to which the Court referred at the outset of the instant footnote, the result in Ohio is very different from that which is compelled by Pennsylvania law—i.e., in Pennsylvania wages, upon their receipt by an employee, immediately lose their exempt status. Therefore, that a transfer of wages by an employee in Texas, either directly or indirectly, might not constitute a transfer for purposes of Texas' Uniform Fraudulent Transfer Act does not compel a similar result in Pennsylvania for

### D. *Actual fraudulent transfer action, § 5104(a)(1).*

In order for the Trustee to prevail on his action under § 5104(a)(1), which action constitutes the first count in his complaint, he must preponderantly prove that the Debtor transferred his wages into the Entireties Checking Account—indirectly, as just set forth herein—with actual intent to hinder, delay, or defraud at least one of his creditors.

The Trustee contends that the creditor who the Debtor sought to so hinder, delay, or defraud was Trizec. The Trustee suggests as the motive for such bad action by the Debtor that he had a desire to avoid having to satisfy any part of the Lease Litigation judgment that Trizec ultimately obtained against him on June 7, 2006.

 12 Pa.C.S.A. § 5104(b) provides a number of different factors for a court to consider when endeavoring to ascertain whether a debtor possessed actual bad intent in making a transfer. The Court finds that some of those factors are present, or are satisfied, with respect to the Debtor's transfers of his salary into the Entireties Checking Account.

For instance, § 5104(b)(1) is satisfied because the direct deposits of the Debtor's compensation were made into the Entireties Checking Account, which account was owned by the Debtor and Mrs. Titus, who would both certainly be insiders of the Debtor himself. Because such direct deposits were made into an entireties bank account, the Debtor obviously retained possession and/or control over them subsequent to such deposits, thereby satisfying § 5104(b)(2). Trizec commenced the Lease Litigation against, *inter alia,* the Debtor in July 2000. Such date precedes when all of the transfers occurred that, by virtue of the Titus Fraudulent Transfer

purposes of Pennsylvania's version of such

Action, are sought to be avoided as fraudulent. As a result thereof, § 5104(b)(4) is satisfied. As held elsewhere within the instant opinion, the factors described in § 5104(b)(8)—(10) are also met in the instant matter.

That many of the factors set forth in § 5104(b) are satisfied, however, does not satisfy the Court—i.e., does not operate so that the Trustee preponderantly proves— that the Debtor intended to hinder, delay, or defraud Trizec when he transferred his wages into the Entireties Checking Account. The Court cannot find that the Debtor had the requisite bad intent when he transferred his salary into the Entireties Checking Account because:

(a) the Debtor indisputably had been directly depositing his wages into an entireties bank account for a long period of time prior to July 2000, which date is when Trizec first began to pursue the Debtor via the Lease Litigation;

(b) there was not sufficient evidence produced at trial to establish that the Debtor continued to directly deposit his salary into the Entireties Checking Account after July 2000 so as to avoid Trizec's reach; and

(c) no evidence was produced at trial to establish that, before Trizec commenced the Titus Fraudulent Transfer Action on April 23, 2007, the Debtor was even aware that his direct deposits of his wages into the Entireties Checking Account might conceivably constitute fraudulent transfers.

Therefore, the Court declines to find that the Debtor acted with actual intent to hinder, delay, or defraud Trizec when he directly deposited his salary into the Entireties Checking Account. Consequently, judgment shall be rendered in favor of the

law.

Debtor and Mrs. Titus with respect to the Trustee's actual fraudulent transfer action under § 5104(a)(1), that is the Trustee's first count in his complaint.

### E. *Constructive fraudulent transfer actions, §§ 5104(a)(2)(ii) and 5105.*

In order for the Trustee to prevail on his actions under §§ 5104(a)(2)(ii) and 5105, which actions constitute the second and third counts in his complaint, he must preponderantly prove that (a) the Debtor did not receive a reasonably equivalent value in exchange for the periodic transfers (i.e., the direct deposits) of his wages into the Entireties Checking Account, and (b) he was either insolvent at the time of, or was rendered insolvent by, such transfers.[7]

### (i) *The amount of deposits that can be the subject of the constructive fraudulent transfer actions.*

As an initial matter, the Court must determine what amount of deposits that have been made into the Entireties Checking Account are attributable to wages that have been earned by the Debtor. According to the Trustee's Trial Exhibit 30, the Debtor deposited at least $1,153,076.84 into the Entireties Checking Account between April 23, 2003, and June 30, 2010. Such amount is comprised of (a) $520,912.81 that is attributable to direct deposits of wages from the Debtor's employment with the Schnader Law Firm, (b) $544,564.03 that the Trustee is unable to attribute to any particular source, and (c) $87,600.00 that stems from withdrawals from the Debtor's retirement account.

■ The $87,600.00 cannot be the subject of the Trustee's constructive fraudulent transfer actions for several reasons. First, such deposits are not comprised of wages that the Debtor earned from the Schnader Law Firm, the transfer of which, according to the Trustee's amended complaint, constitutes the universe of that which he seeks to avoid as fraudulent transfers. Instead, such deposits are comprised of withdrawals from the Debtor's retirement account; these transfers clearly are not those that are sought to be avoided by way of the Trustee's amended complaint. Second, the transfers from the Debtor's retirement account into the Entireties Checking Account could not constitute fraudulent transfers even if the Trustee had pled as much in his amended complaint. The Court so holds because retirement assets are generally exempt, thus do not constitute assets under Pennsylvania's Uniform Fraudulent Transfer Act, and consequently cannot be the subject of a transfer, let alone a fraudulent transfer, under such act.

With respect to the other two amounts (i.e., $520,912.81 and $544,564.03), such amounts must be reduced, for the reasons expressed earlier herein, by the amount of the deposits that were made outside of the applicable lookback period for the instant matter, that is those deposits that occurred after April 23, 2007. Such adjustment results in the $520,912.81 figure being reduced to $336,909.03 and the $544,564.03 figure being reduced to $518,669.42.

The Trustee has preponderantly proven that the $336,909.03 worth of deposits is attributable to direct deposits of wages from the Debtor's employment with the

---

**7.** To be more precise, the Trustee, with respect to the issue of insolvency, must prove either (a) that the Debtor was insolvent at the time of, or was rendered insolvent by, the direct deposits (§ 5105), or (b) that the Debt- or, while such direct deposits were being made, intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due (§ 5104(a)(2)(ii)).

Schnader Law Firm for the period from April 23, 2003, to April 23, 2007. However, the Trustee has not preponderantly proven as much with respect to the $518,669.42 worth of deposits.

The Court will nevertheless attribute a substantial portion of such $518,669.42 worth of deposits to direct deposits of the Debtor's wages given that (a) such deposits, according to the Trustee's Trial Exhibit 30, were all made during the period from April 30, 2003, to April 21, 2006, (b) the Trustee has not been given information by the Debtor from which he can ascertain, for the period prior to June 2, 2006, what portion of such deposits are attributable to such wages of the Debtor, (c) the Debtor, as set forth above, bears the burden of producing such evidence, and (d) the Court itself can readily ascertain, from a brief examination of such trial exhibit, that many of the deposits in question are indeed attributable to direct deposits of the Debtor's wages. Such attribution of such $518,669.42 worth of deposits is also appropriate, the Court concludes, because the Court is certain that the Schnader Law Firm deposited substantially more than $336,909.03 in wages directly into the Entireties Checking Account between April 23, 2003, and April 23, 2007. The Court is certain of as much because (a) Trial Exhibit A of the Debtor and Mrs. Titus reveals that the Debtor earned $575,228.25 from the Schnader Law Firm during the roughly equivalent period from June 2, 2006, to July 1, 2010, and (b) the Court does not understand that the Debtor's salary with the Schnader Law Firm increased subsequent to April 23, 2007.

Therefore, the Court concludes that the Trustee has preponderantly proven that the Debtor indirectly deposited into the Entireties Checking Account at least $575,228.25 worth of wages that he earned from the Schnader Law Firm between April 23, 2003, and April 23, 2007.

### (ii) *Whether the Debtor received reasonably equivalent value?*

As set forth earlier herein, the Court holds that the direct deposits of the Debtor's salary into the Entireties Checking Account may constitute constructive fraudulent transfers (a) unless they were spent on necessities, or (b) if they were used to purchase other assets which are presently held by the Debtor and Mrs. Titus as entireties property, regardless of whether such entireties property constitutes a necessity. A corollary of the preceding holding is that the Debtor did not receive reasonably equivalent value in return for such direct deposits (a) unless they were subsequently spent on necessities, or (b) if they were subsequently used to purchase other entireties property. *See Meinen,* 232 B.R. at 842–43.

As also set forth earlier herein, the Trustee bears the burden of proving that the Debtor did not receive reasonably equivalent value in return for such direct deposits. That means that the Trustee, in order to prevail on his constructive fraudulent conveyance counts, must preponderantly prove that such deposits either (a) were not spent on necessities, or (b) were spent on other entireties assets.

According to the Trustee's Trial Exhibit 28, $864,293.23 worth of expenditures occurred between April 23, 2003, and June 30, 2010, that (a) were funded by deposits that were made into the Entireties Checking Account during the same time period, and (b) were for things that either did not constitute necessities or were entireties assets themselves. The deposits that funded these particular expenditures are the deposits that the Trustee consequently contends constitute constructive fraudulent transfers. For the reasons set forth be-

low, the Court reduces the $864,293.23 figure arrived at by the Trustee to $423,980.18.

First, many of the $864,293.23 worth of expenditures that have been isolated by the Trustee in his Trial Exhibit 28 were made outside of the lookback period that applies to the instant matter, that is such expenditures occurred subsequent to April 23, 2007. The Trustee, as set forth earlier herein, can only prevail on his constructive fraudulent transfer actions with respect to those deposits of his wages that occurred during the lookback period, that is between April 23, 2003, and April 23, 2007. Because the Trustee bears the burden of proving that deposits that were made prior to April 23, 2007, were utilized to fund these particular expenditures that occurred subsequent to such date, and since, the Court concludes, the Trustee has not satisfied such burden, the Trustee cannot avoid as fraudulent those deposits that are equal in amount to the sum of such expenditures.[8]

Second, the Court agrees with the Trustee that the $2,600.00 in political contributions that were made by the Debtor during the lookback period do not constitute necessities. However, pursuant to 11 U.S.C. § 544(b)(2), the Court cannot permit the avoidance of those deposits (i.e., transfers) that were then utilized to fund nonpolitical charitable contributions, even if such contributions occurred during the lookback period.

Third, the Court concludes that certain of the expenditures, or even categories of expenditures, that have been isolated by the Trustee and that are included in the $864,293.23 figure actually constitute necessities. The following expenditures, which are taken directly from the Trustee's Trial Exhibit 28, are found to constitute necessities:

(a) All of the various insurance policy premium payments that were made during the lookback period, other than $2,759.00 in premium payments for insurance on a vacation cottage in Bradford, PA;[9]

---

**8.** A similar proof issue for the Trustee arises with respect to the avoidance of at least a few deposits that likely occurred pre-lookback period but that funded expenditures that occurred early in the lookback period. The Court, when faced with a similar issue in *Arbogast*, permitted the Trustee to potentially avoid such deposits as fraudulent. *See Arbogast*, 466 B.R. at 318–19. The Court did so in *Arbogast* because it determined therein that, after examining trial exhibits, "it [wa]s more likely than not that at least an equal amount of pre-April 23, 2007 direct deposits funded post-April 23, 2007 disbursements as pre-April 23, 2003 direct deposits funded post-April 23, 2003 disbursements." *Id.* The Court finds that such reasoning applies equally to the facts in the instant matter. Accordingly, the Court shall allow the Trustee to potentially avoid as fraudulent those deposits that occurred pre-lookback period but that funded expenditures that occurred early in the lookback period.

**9.** While going over his Trial Exhibit 52 with the Debtor at trial, the Trustee was made aware that the Debtor, throughout the applicable lookback period, had annually been electing to reinvest dividends that he had been earning on a Northwestern Mutual life insurance policy. The Trustee apprised the Court and his opposition at trial that he henceforth intended to pursue such dividend reinvestments as fraudulent transfers in addition to the Debtor's indirect transfers of his wages into the Entireties Checking Account. The Court must reject such attempt by the Trustee, however, for several reasons. First, and as was explained earlier, the Trustee, as set forth in his complaint and second amended complaint by which he prosecutes the Titus Fraudulent Transfer Action, pursues therein as fraudulent transfers only the Debtor's indirect transfers of his wages from the Schnader Law Firm that were made into the Entireties Checking Account. The Debtor testified, the Trustee appeared to accept as true, and the Court finds in any event, that

(b) All of the monthly parking fees paid to Central Property Service during the lookback period, which total $2,885.40;

(c) All of the fees paid to Myers & Model, PC during the lookback period for income tax preparation, which fees are found to be reasonable in amount and which total $1,555.00;

(d) All of the payments that were made to Louis P. Vitti & Associates during the lookback period for legal fees, which fees are found to be reasonable in amount and which total $11,606.86;

(e) A payment made to Homewood Cemetery on March 16, 2007, in the amount of $350.00; and

(f) $25,791.50 in checks that were identified by the Trustee in his Trial Exhibit 53 as having been written for an unknown purpose (Check No's. 2814, 2828 & 3102), which purpose was then disclosed by the Debtor at trial to be payments for various taxes.[10]

 Taking into account the foregoing rulings, the Court finds that only $177,188.24 worth of the expenditures that were isolated by the Trustee in his Trial Exhibit 28 were made during the lookback period for things that do not constitute necessities. Such expenditures are set forth as follows: [11]

| | |
|---|---|
| 1. Art/Home Furnishings | $ 5,874.74 |
| 2. Clubs | $ 29,642.89 |
| 3. Political Contributions | $ 2,600.00 |
| 4. Entertainment | $ 14,011.46 |
| 5. Jewelry/Furs | $ 783.90 |
| 6. Payments to Family | $ 7,770.85 |
| 7. Season Tickets to Various Functions | $ 48,202.44 |
| 8. Insurance on Vacation Home | $ 2,759.00 |
| 9. Prudential Realty Co. pmts. (for adult daughter) | $ 3,759.12 |

such dividend reinvestments were transacted entirely without the involvement of the Entireties Checking Account. Second, no other vehicle, such as another fraudulent transfer action, exists whereby the Trustee could pursue the avoidance and then recovery of the dividend reinvestments. Third, the Debtor did not consent at trial to having the Trustee pursue such dividend reinvestments as fraudulent transfers; instead, he objected to such pursuit, and the Court will not allow any amendment by the Trustee at this time of his second amended complaint so that he may now pursue such dividend reinvestments. Therefore, the Court will not enter any order that avoids such dividend reinvestments on the ground that they constituted fraudulent transfers.

10. The Trustee, in his Trial Exhibit 53, identified an additional $9,531.00 in checks as having been written for an unknown purpose. The Debtor at trial was unable to disclose, just from his memory, what these checks were written for. However, the Debtor testified credibly at trial that the Trustee, for whatever reason, failed to demand that the checks in question be produced at any point during discovery. *See* May 25, 2011 Trial Tape, from 12:25:51—12:26:00. Consequently, the Court shall rule that deposits in the amount of the aforesaid additional $9,531.00 in checks will not be potentially avoidable as fraudulent transfers.

11. The Trustee, in his Trial Exhibit 28, further divides many of the expenditures within the following categories by the person who actually drew the check or made payment out of the Entireties Checking Account so as to satisfy such expenditures (i.e., the Debtor, Mrs. Titus, the two of them together, or undetermined). Such division was necessitated by certain statements of the law that were made within the State Court Titus Decisions. Because this Court will not follow such decisions, this Court finds to be irrelevant to the resolution of the instant matter such division, that is who, in particular, was responsible for making payment out of the Entireties Checking Account with respect to any particular expenditure. This Court concludes instead that what is relevant is simply whether such expenditures were funded by the wages of the Debtor that were deposited directly into the Entireties Checking Account.

| 10. Miscellaneous Expenditures [12] | $ 61,783.84 |
|---|---|
| Total | $177,188.24 |

The Court must add to the foregoing $177,188.24 figure the $10,175.58 worth of installment payments on the Fifth/Third Bank loan that were funded by deposits into the Entireties Checking Account because such loan, according to the Debtor, was obtained in order to purchase an automobile that is presently owned by the Debtor and Mrs. Titus as tenants by the entirety.

■ Finally, the Court must add to the foregoing $177,188.24 and $10,175.58 amounts the $236,616.36 worth of credit card payments that were made between May 8, 2003, and April 2, 2007, which expenditures (a) were funded by deposits into the Entireties Checking Account, and (b) are listed on pages 9 through 13 of the Trustee's Trial Exhibit 28. The Court must do so because (a) the Debtor and Mrs. Titus have failed to provide the Trustee with information, such as credit card statements, from which the Trustee can ascertain what the $236,616.36 worth of credit card charges were for, and (b) the Debtor and Mrs. Titus, as set forth above, bear the burden of producing such evidence. Put differently, because the Debtor and Mrs. Titus have not produced the requisite information, the Court shall conclude that the $236,616.36 worth of credit card charges were incurred so as to purchase things that either did not constitute necessities or were entireties assets themselves.

The sum of $177,188.24, $10,175.58, and $236,616.36 equals $423,980.18. This amount represents expenditures that (a) were funded by deposits that were made into the Entireties Checking Account between April 23, 2003, and April 23, 2007, and (b) were for things that either did not constitute necessities or were entireties assets themselves (hereafter "the Objectionable Expenditures").

The Trustee, as set forth above, has preponderantly proven that the Debtor indirectly deposited into the Entireties Checking Account at least $575,228.25 worth of wages that he earned from the Schnader Law Firm between April 23, 2003, and April 23, 2007. That is certainly more than enough to cover the $423,980.18 in Objectionable Expenditures that were funded by money that came from such account. However, in order for the Trustee to prevail on his constructive fraudulent transfer actions, he must preponderantly prove, in particular, that the direct deposits of the Debtor's wages into the Entireties Checking Account funded the Objectionable Expenditures. Put differently, the Trustee, in order to so prevail, needs to preponderantly prove that no money that was deposited into the Entireties Checking Account during the lookback period other than such indirect wage transfers funded such expenditures.

Trial Exhibit A of the Debtor and Mrs. Titus reveals that, for the period between June 2, 2006, and July 1, 2010—i.e., a period roughly of the same length as April 23, 2003, to April 23, 2007—the Debtor and

---

12. The "Miscellaneous Expenditures" category is made up of those expenditures that are listed on pages 30 and 31 of the Trustee's Trial Exhibit 28 that were incurred between June 8, 2003, and March 31, 2007, except for the $1,000.00 contribution to the University of Notre Dame (nonpolitical contribution that is not avoidable pursuant to § 544(b)(2)) and the $350.00 charge to Homewood Cemetery (a necessity, as set forth above). The largest expenditure in this category is a $50,000.00 retainer fee that was paid by the Debtor on behalf of all of the former partners of T & M. The Court concludes that such expenditure does not constitute a reasonable legal fee for the Debtor to be incurring solely by himself and, therefore, rules that such fee does not constitute a necessity.

Mrs. Titus deposited $142,974.00 worth of social security benefit checks into the Entireties Checking Account. Because the Court does not understand the level of social security benefits of the Debtor and Mrs. Titus to have appreciably changed between the two aforementioned periods, the Court must conclude that roughly $142,974.00 worth of social security benefits were deposited into the Entireties Checking Account during the lookback period in addition to the aforesaid $575,228.25 worth of wage deposits. The Court also finds that it is at least as likely as not that such $142,974.00 worth of deposited social security benefits funded an equal portion of the Objectionable Expenditures. Therefore, with respect to $142,974.00 worth of the Objectionable Expenditures, the Trustee has not preponderantly proven that the same were funded by indirect transfers by the Debtor of his wages into the Entireties Checking Account.[13]

In light of the foregoing, the Trustee has preponderantly proven that $281,006.18 worth of the Objectionable Expenditures were funded by indirect transfers of the Debtor's wages into the Entireties Checking Account (i.e., $423,980.18— $142,974.00). The Trustee has also consequently proven by a preponderance of the evidence that the Debtor did not receive reasonably equivalent value in return for $281,006.18 worth of his wages that were deposited directly (i.e., that he indirectly transferred) into the Entireties Checking Account.

### (iii) *Whether the Debtor was insolvent?*

The $281,006.18 worth of direct deposits of the Debtor's wages for which he did not receive reasonably equivalent value in return do not automatically constitute constructive fraudulent transfers under § 5104(a)(2)(ii) and/or § 5105. Such direct deposits constitute constructive fraudulent transfers under § 5104(a)(2)(ii) only if, while they were being made, the Debtor "intended to incur, or believed or reasonably should have believed that ... [he] would incur, debts beyond ... [his] ability to pay as they became due." 12 Pa.C.S.A. § 5104(a)(2)(ii). Such direct deposits constitute constructive fraudulent transfers under § 5105 only if "the [D]ebtor was insolvent at th[e] time [of the direct deposits in question] or the [D]ebtor became insolvent as a result of [such direct deposits]." 12 Pa.C.S.A. § 5105.

"A debtor is insolvent if, at fair valuations, the sum of the debtor's debts is greater than all of the debtor's assets." 12 Pa.C.S.A. § 5102(a) (Purdon's 2012). "Assets under this section do not include property ... that has been transferred in a

---

**13.** As set forth above, the Court imposed on the Debtor and Mrs. Titus the burden of producing evidence, such as monthly statements, regarding what $236,616.36 worth of credit card charges were for (i.e., those charges that were then satisfied with the $236,616.36 worth of credit card payments that were made between May 8, 2003, and April 2, 2007, that are listed on pages 9 through 13 of the Trustee's Trial Exhibit 28). The Court imposed such burden on the Debtor and Mrs. Titus because they possessed complete control over, and thus had the ability to produce, such information, but chose not to produce the same. In contrast, the Court does not find that the Debtor and Mrs. Titus could have produced any meaningful information from which the Trustee could have then ascertained with any precision whether, and to what extent, their social security benefits did or did not fund $142,974.00 worth of the Objectionable Expenditures (i.e., evidence that would have allowed the Trustee to trace particular bank account deposits to subsequent withdrawals or expenditures made out of such bank account). Because the Debtor and Mrs. Titus could not have produced any such meaningful evidence, the Court will not impose upon them the burden of doing so.

manner making the transfer fraudulent under this chapter." 12 Pa.C.S.A. § 5102(d) (Purdon's 2012). Therefore, "exclud[ed] from the computation of the value of the debtor's assets [is] any value that can be realized only by avoiding a transfer of an interest formerly held by the debtor." 12 Pa.C.S.A. § 5102, Committee Cmt. 4 (1993). Also excluded from the computation of the value of a debtor's assets are exempt property and property held as tenants by the entirety to the extent that such tenancy cannot be severed by a creditor of only one tenant. 12 Pa.C.S.A. § 5102, Committee Cmt. 1 (1993).

■■■ The Court finds that, as was the case for the Debtor when he filed for bankruptcy, he practically did not possess any assets for purposes of § 5102(a) during any portion of the lookback period for the Titus Fraudulent Transfer Action (i.e., between 4/23/03 and 4/23/07). The Court finds as it does because all of the Debtor's assets during such period were either entireties assets, exempt retirement assets, or other exempt assets. Relevant to such finding, the Court holds that the value of the direct deposits of the Debtor's wages into the Entireties Checking Account cannot be counted as an asset for purposes of insolvency testing under § 5102(a). The Court so holds because such direct deposits were instantly transferred into such bank account, which bank account, because it is an entireties asset, cannot itself be considered when assessing the value of the Debtor's assets for purposes of § 5102(a). Some portion of the direct deposits also cannot be counted as an asset for purposes of § 5102(a) by virtue of the application of § 5102(d) to the instant matter.

■■■ The Debtor and Mrs. Titus contend that the fact that the Debtor had no assets during the applicable lookback period should not be fatal to their defense.

They so argue because they contend that, during such lookback period, the Debtor also essentially had no debt. The Debtor and Mrs. Titus argue that the Debtor had no debt during the applicable lookback period because, they maintain, the Debtor's liability for Trizec's claim (i.e., the claim that has now been reduced to the Lease Litigation judgment) cannot be counted as debt during such period for purposes of § 5102(a).

The Court understands the Debtor and Mrs. Titus to advance several reasons for their position that the Debtor's liability for Trizec's claim cannot be so counted, namely (a) that Trizec's claim was not reduced to judgment until June 7, 2006, (b) that such claim was consequently not liquidated until more than three years of the applicable lookback period had already passed, and (c) that such claim of Trizec was still subject to genuine dispute by virtue of appeals that did not conclude until July 3, 2007, or after the end of the applicable lookback period. The Court rejects such arguments for several reasons, and thus disagrees that the Debtor's liability for Trizec's claim cannot be counted for purposes of insolvency testing under § 5102(a).

First, several of the definitions in § 5101(b) dictate that the Debtor's liability for Trizec's claim be so counted. In particular, "debt" is defined as "[l]iability on a claim." 12 Pa.C.S.A. § 5101(b). "Claim" is defined as "[a] right to payment, *whether or not the right is reduced to judgment, liquidated, unliquidated,* fixed, contingent, matured, unmatured, *disputed, undisputed,* legal, equitable, secured or unsecured." *Id.* (emphasis added). Given the foregoing definitions, it matters not, when determining whether a debt counts for purposes of insolvency testing under § 5102(a), that such debt (a) has not yet been reduced to

judgment, (b) is still unliquidated, or (c) is subject to a genuine dispute.

Second, and perhaps more importantly, the foregoing holding and definitional analysis by the Court is supported by case authority that, because it construes very similar, if not relevantly identical, definitional language in the earlier, since replaced, Uniform Fraudulent Conveyance Act, still arguably constitutes binding case precedent with respect to the instant matter. *See United States v. Green,* 201 F.3d 251, 257 (3rd Cir.2000) (citing *Baker v. Geist,* 457 Pa. 73, 321 A.2d 634, 636–37 (1974)); *Norfolk & Western Railroad Co. v. Wasserstrom,* 1991 WL 183385 at *2 (E.D.Pa.1991); *Keeney v. Stremmel,* 1991 WL 341742 at 1 (Pa.Com.Pl.1991). Such case authority stands for the proposition, in particular, that, for purposes of determining a debtor's insolvency status within the context of a constructive fraudulent conveyance action, a disputed, unliquidated claim that has yet to be reduced to judgment nevertheless must be counted as debt, and it must be counted as debt for a period even prior to the filing of a lawsuit against such debtor. *See Green,* 201 F.3d at 257 (citing *Geist* for the proposition that "the Pennsylvania Supreme Court has found that awareness of a probable legal action against a debtor amounts to a debt for purposes of determining solvency"); *Geist,* 321 A.2d at 635–37 (appellee's debt to appellant existed, thereby making appellee insolvent, prior to October 24, 1969, which date preceded (a) the filing of the tort action against appellee, (b) the verdict that resulted in judgment against appellee, and (c) the conveyance engaged in by appellee that was ultimately determined to be fraudulent); *Wasserstrom,* 1991 WL 183385 at *2 (same); *Keeney,* 1991 WL 341742 at *1 (same); Kit Weitnauer, *Anatomy of a Fraudulent Transfer Case: Hidden Complications,* 2008 Ann. Surv. of Bankr.Law Part I § 10 (Norton 2008)

("the determination of the amount of the disputed claim 'relates back' to the time of the asset transfer for the purposes of determining insolvency").

Third, no case authority exists for the proposition that, just because "[a] presumption of insolvency [under § 5102(b) ] does not arise from nonpayment of a debt as to which there is a genuine bona fide dispute," 12 Pa.C.S.A. § 5102, Committee Cmt. 2 (1993), a disputed debt must also not be counted when conducting the balance sheet test for insolvency under § 5102(a).

Therefore, this Court holds:

(a) that Trizec's claim against the Debtor counts as indebtedness of the Debtor, for purposes of determining the Debtor's insolvency under § 5102(a), going all the way back to at least July 2000, which is when Trizec brought its action in the Common Pleas Court against, *inter alia,* the Debtor;

(b) that the liquidation of such claim of Trizec, which claim has now been reduced to the Lease Litigation judgment, relates back to at least the beginning of the applicable lookback period on April 23, 2003, for purposes of determining the Debtor's insolvency under § 5102(a); and

(c) that, by virtue of the existence of such indebtedness throughout the applicable lookback period, the Debtor was insolvent for purposes of § 5102(a) throughout such lookback period.

■ Finally, this Court's determination that the Debtor was insolvent for purposes of § 5102(a) throughout the applicable lookback period is not affected by the fact that the incurrence by the Debtor of his indebtedness to Trizec may have perhaps created in the Debtor's favor a correspond-

ing asset in the form of a right against all of the other former T & M partners for contribution. The Court so holds because, even accepting *arguendo* that Trizec's claim may have created such a contribution right in the Debtor's favor, an argument that the existence of such contribution right should operate, for purposes of an insolvency determination, to completely counterbalance the weight of Trizec's claim is flawed, and such flaw should be readily apparent. The flaw in such an argument is that the value of such contribution right in the Debtor's favor could be worth as much as the entire amount of the Debtor's joint and several liability on the indebtedness that he owes to Trizec. Indeed, if such contribution right were worth as much as the amount of such indebtedness owed to Trizec, then the Debtor would ultimately not be liable for even a very small percentage of such debt as between himself and his former T & M partners, which is certainly not the case.

Therefore, the Debtor was insolvent throughout the entirety of the applicable lookback period (i.e., from 4/23/03 to 4/23/07).

#### (iv) *Resolution of actions under §§ 5104(a)(2)(ii) and 5105.*

As a consequence of all of the foregoing analysis, the Trustee has proven his case under § 5105, and is thus entitled to a judgment in his favor regarding his action brought thereunder in the amount of $281,006.18. Briefly, the Trustee has preponderantly proven that (a) Trizec's claim arose well before all of the direct deposits that were made between April 23, 2003, and April 23, 2007, (b) the Debtor did not receive reasonably equivalent value in return for such direct deposits to the extent of $281,006.18, and (c) the Debtor was insolvent at all times between April 23, 2003, and April 23, 2007.

The Court concludes that the Trustee is not potentially entitled to a judgment under § 5104(a)(2)(ii) for an amount in excess of $281,006.18. Therefore, and because he is entitled to a judgment for such amount via his action under § 5105, it really matters not whether the Trustee (a) has also preponderantly proven that the Debtor, while such direct deposits were being made, intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due, and (b) could thus also prevail under § 5104(a)(2)(ii). The Court holds summarily, however, that, in light of all of the foregoing analysis, the Trustee could prevail under § 5104(a)(2)(ii) as well in the amount of $281,006.18.

Pursuant to § 550(a)(1), the Court will impose the foregoing judgment for $281,006.18 upon, that is against, the Debtor and Mrs. Titus jointly and severally.

### II. *Objections to Debtor's Exemptions.*

In his Bankruptcy Schedule C the Debtor has elected to claim the exemptions afforded to him under 11 U.S.C. § 522(b)(3), that is those exemptions provided by federal nonbankruptcy, state and local law, as well as the exemption generally of property held as a tenant by the entirety. Thus, the Debtor has elected not to take those exemptions afforded to him under 11 U.S.C. § 522(b)(2), that is the federal exemptions provided under 11 U.S.C. § 522(d).

As set forth above, the Trustee and TRZ object to the Debtor's exemption of (a) what the Debtor characterizes in his Bankruptcy Schedule C as wages owed to him from his employer that he had earned but not yet been paid as of the commencement date of the instant bankruptcy case, (b) his interest in a life insurance policy with a cash surrender value of $220,000.00, (c) his retirement account valued at $1,549,795.00

as of the commencement of the instant case, and (d) his interest in various property that he owns with Mrs. Titus as tenants by the entirety.

### A. Objection to Exemption of Entireties Property.

■■■ The Court will first address the Trustee's threshold objection to the Debtor's exemption of the various entireties property that he owns with Mrs. Titus. As the Court understands it, the Trustee, at the outset, takes the position that the Debtor may not exempt his interests in such entireties property if, and to the extent that, the Trustee prevails in the Titus Fraudulent Transfer Action. The basis for such position by the Trustee appears to be that if, and to the extent that, the Trustee so prevails, then such entireties property can be executed upon to satisfy a judgment, thereby negating an exemption in such property.

The Court rejects outright the foregoing position of the Trustee because, even though the Trustee has now prevailed in the Titus Fraudulent Transfer Action by receiving a judgment in his favor therein for $281,006.18, such judgment, as set forth earlier herein, liquidates a post-petition rather than a pre-petition claim against the Debtor. Such point is fatal to the Trustee's position because only pre-petition joint claims (i.e., pre-petition claims against both the Debtor and Mrs. Titus) may serve to disqualify an exemption by the Debtor in entireties property under § 522(b)(3)(B). Therefore, the Court overrules the foregoing objection by the Trustee to the Debtor's exemption of the various pieces of entireties property that he owns with Mrs. Titus.

As an aside, the Court notes that the Trustee actually loses nothing by virtue of the Court's overruling of his foregoing exemption objection. That is because the

Trustee's ability to collect on the aforesaid $281,006.18 judgment is entirely unaffected by either the Debtor's Chapter 7 discharge that he has obtained by way of the instant case or his exemption of property therein; the foregoing result stems from the fact, as just alluded to, that such judgment liquidates a post-petition rather than a pre-petition claim against the Debtor.

### B. Objection to Exemption of Debtor's Retirement Account.

■■■ The Debtor has exempted his retirement account pursuant to both 11 U.S.C. § 522(b)(3)(C) and 42 Pa.C.S.A. § 8124(b)(1)(ix), and contends that it is also excluded from property of his bankruptcy estate pursuant to 11 U.S.C. § 541(c)(2). Paragraph (C) of § 522(b)(3) allows a debtor to exempt, in full, "retirement funds to the extent that those funds are in a fund or account that is exempt from taxation under section 401, 403, 408, 408A, 414, 457, or 501(a) of the Internal Revenue Code of 1986." 11 U.S.C.A. § 522(b)(3)(C) (West 2012). The Trustee and TRZ, as the objecting parties, bear the burden of proving that the Debtor's exemptions, including that of his retirement account, are inappropriate. See Fed. R.Bankr.P. 4003(c), 11 U.S.C.A. (West 2012). The Trustee and TRZ have failed—and, in fact, have not even attempted—to prove that the Debtor's retirement account is not just that, or that the same is not exempt from taxation under 26 U.S.C. (IRC) §§ 401, 403, 408, 408A, 414, 457, or 501(a). Therefore, the Court concludes that the Debtor's retirement account may be exempted in full pursuant to § 522(b)(3)(C).

■■■ Because the Court concludes that the Debtor's retirement account may be exempted in full pursuant to § 522(b)(3)(C), the Court need not really address matters regarding whether

§ 541(c)(2) operates to exclude such retirement account from bankruptcy estate property, or whether such retirement account can also be exempted pursuant to § 8124(b)(1)(ix). However, the Court notes as an aside that TRZ, when it objects to the Debtor's retirement account, appears either to (a) neglect the existence of § 522(b)(3)(C) and to instead consider only the impact of § 8124(b)(1)(ix) on the Debtor's exemption, or (b) assume that limitations are built into § 522(b)(3)(C) that are similar in nature to those that comprise part of § 8124(b)(1)(ix). To the extent that TRZ assumes that such limitations have been incorporated into § 522(b)(3)(C), TRZ is simply mistaken. *See Arbogast,* 466 B.R. at 324–26. To the extent that TRZ focuses only on § 8124(b)(1)(ix), the Court holds that it matters only that the Debtor correctly cited § 522(b)(3)(C) as a ground for exempting his retirement account, not that the Debtor also cited alternative grounds for excluding or exempting his retirement account such as § 8124(b)(1)(ix).

Finally, the Trustee and TRZ appear to object to the Debtor's exemption of his retirement account, in part, on the basis that certain of the contributions that were made into such account constitute fraudulent transfers. As set forth earlier herein, the Trustee, via the Titus Fraudulent Transfer Action, cannot successfully pursue as being fraudulent transfers any contributions that have been made into the Debtor's retirement account. The Court can now also rule that, because it has determined that the Debtor may exempt, without any limitation, his retirement account pursuant to § 522(b)(3)(C), he need not utilize § 8124(b)(1)(ix) to make such exemption. Consequently, the Trustee and TRZ also cannot utilize the "fraudulent conveyances" limitation that is found at § 8124(b)(1)(ix)(C), which means that it matters not to the exemption that the Debtor has taken in his retirement account whether certain of the contributions that were made into such account constitute fraudulent transfers.

In light of the foregoing, the objection of the Trustee and TRZ to the Debtor's exemption of his retirement account is overruled.

**C. Objection to Exemption of Life Insurance Policy Interest.**

■ The Debtor has exempted his interest in a life insurance policy, including the cash surrender value of $220,000.00 that is attributable to such policy, pursuant to 42 Pa.C.S.A. § 8124(c)(6). TRZ and the Trustee contend that none of such cash surrender value may be so exempted. The Court holds that the Debtor has appropriately exempted such cash surrender value pursuant to § 8124(c)(6). *See In re La-Mond,* 2008 WL 251801 at 1 (Bankr. W.D.Pa.2008). Therefore, the objection by the Trustee and TRZ to the cash surrender value attributable to the life insurance policy in question is overruled.

**D. Exemption objection based on position that certain additions to exempted assets constitute fraudulent transfers.**

■ The Trustee and TRZ appear to object to some portion of many of the Debtor's exemptions on the basis that certain of the additions to the assets sought to be exempted constitute fraudulent transfers. The Trustee and TRZ apparently do not confine this particular exemption objection to just the Debtor's exemption of his retirement account (i.e., his exemption of particular contributions that were made into such account).

The Court must overrule this exemption objection for several reasons. First, the statutory provisions upon which the Debt-

or relies for his exemption of the entireties property (i.e., § 522(b)(3)(B)) and his interest in the life insurance policy inclusive of its cash surrender value (i.e., § 8124(c)(6)) do not contain any "fraudulent conveyances" limitation like that which is found in Pennsylvania's exemption provision for retirement accounts (i.e., § 8124(b)(1)(ix)(C)). Second, the Court is unaware of any broad general authority, be it statutory, case, treatise, or otherwise, for simply denying a debtor an exemption to the extent that he has engaged in fraudulent transfers. Third, § 8124(b)(1)(ix)(C) is inapplicable, for the reasons set forth above, to the Debtor's exemption, in particular, of his retirement account.

Fourth, the Court, in the course of resolving the Titus Fraudulent Transfer Action, has avoided as being fraudulent transfers a few of those additions that the Debtor has made to assets that he now seeks to exempt. The Court, however, as a remedy under § 550(a)(1) for the avoidance of such fraudulent transfers, has determined that it is more prudent to grant to the Trustee a money judgment rather than to order the return of some portion of particular tangible assets that the Debtor now holds and seeks to exempt. The Court also notes that, even if it were to order the return of particular property under § 550(a)(1) as a remedy in the Titus Fraudulent Transfer Action, the ordering of the return of such property is not actually the same thing as denying an otherwise appropriate exemption in such property. Finally, the Court points out that its decision to grant the Trustee a money judgment under § 550(a)(1) rather than to order the return of particular property that the Debtor has now exempted will not operate to, in any way, harm the Trustee's collection efforts with respect to such money judgment. The Court so concludes because, as the Court has previously held herein, such money judgment liquidates a post-petition claim, which means that the Trustee's ability to collect on such judgment will be entirely unaffected by either the Debtor's Chapter 7 discharge that he has obtained by way of the instant case or his exemption of property therein.

Therefore, this particular exemption objection by the Trustee and TRZ is overruled.

**E. _Exemption Objection regarding so-called unpaid wages._**

■ The Trustee and TRZ both object to the Debtor's exemption of what he characterizes in his Bankruptcy Schedule C as wages that are owed to him by his employer that he had earned but not yet been paid as of the commencement date of the instant bankruptcy case. The amount of such wages is not indicated in such Schedule C, but the parties agree that such amount is the same $74,412 that is listed on the Debtor's Bankruptcy Schedule B as an interest in a capital account at the Schnader Law Firm, which is the Debtor's current employer.

The Debtor exempts such $74,412 pursuant to 42 Pa.C.S.A. § 8127(a), which, as set forth earlier herein, provides generally that "[t]he wages, salaries and commissions of individuals shall while in the hands of the employer be exempt from any attachment, execution or other process," 42 Pa.C.S.A. § 8127(a). The Debtor contends that such money can be exempted pursuant to § 8127(a) because, as of the date when the instant bankruptcy case was commenced, the Debtor was an employee of, rather than a partner with, the Schnader Law Firm. Therefore, argues the Debtor, the Schnader Law Firm was then his employer, and what he was then earning from the Schnader Law Firm constituted wages or a salary.

The Trustee and TRZ disagree with the Debtor's characterization of the $74,412 at issue. They essentially contend that, because such money still sits in a capital account at the Schnader Law Firm, and since the Debtor indisputably was at one time a partner at such firm, such money must constitute something other than wages or salary, even if it rests in the hands of an entity that is now the Debtor's employer. For the foregoing reason, the Trustee and TRZ object to any exemption of such $74,412 pursuant to § 8127(a).

The Court agrees with the position of the Trustee and TRZ and will, therefore, sustain their objection to the Debtor's exemption of the $74,412 under § 8127(a). The Court rules as it does because it agrees with the Trustee and TRZ that, because such $74,412 still sits in a capital account at a law firm where the Debtor was once a partner, such money must constitute something other than wages or salary. Crucial to the Court's decision is its holding, in turn, that money which is earned by an individual in his capacity as a partner, as a matter of law, cannot constitute wages or salary. Because the $74,412 still sits in the aforesaid capital account, the Trustee and TRZ have preponderantly proven, that is it is more likely than not, that such money represents either (a) a contribution that the Debtor made to the Schnader Law Firm when he was a partner there, or (b) earnings of the Debtor while he worked at such firm as a partner, which earnings were retained for whatever reason; neither of the foregoing, the Court holds, constitute wages or salary.

 Although the Court sustains the objection of the Trustee and TRZ to the Debtor's exemption of said $74,412, the Court will not order that the Debtor immediately turn over such money to the Trustee. That is because (a) the Schnader Law Firm presently possesses such money, and

(b) such firm, according to the Debtor's Bankruptcy Schedule D, possesses a security interest in such money. If the Trustee and TRZ wish to pursue further the collection of such $74,412, then they will have to initiate a turnover action against the Schnader Law Firm to recover such money.

### III. *Objections to TRZ's Claim.*

The Debtor and the Schnader Law Firm both object to the original and amended proofs of claim that TRZ has filed in the instant bankruptcy case. Such proofs of claim indicate that TRZ rather than Trizec is the creditor to whom the Debtor owes the joint and several Lease Litigation judgment. TRZ claims that it is the entity to whom the Debtor owes such judgment on the basis that it is the successor in interest to Trizec. The basis for the objections to TRZ's claim by the Debtor and the Schnader Law Firm is that TRZ is not a successor in interest to Trizec and, thus, is not the proper entity to whom the Debtor owes the joint and several Lease Litigation judgment.

At the outset, the Court notes that it suspects that the motivation of the Debtor, and perhaps the Schnader Law Firm as well given that it is the Debtor's current employer, in objecting to TRZ's claim is (a) to defeat the standing of those who prosecute the Titus Fraudulent Transfer Action and the objections to the Debtor's exemptions, and/or (b) to obviate the need for any recovery by way of such fraudulent transfer action and exemption objections, thereby also obviating the need to further prosecute such matters. The Court, for the reasons briefly set forth below, holds that, even if it were to disallow TRZ's claim for the reason advanced by the Debtor and the Schnader Law Firm, such disallowance would neither affect the standing of those who prosecute the instant matters

nor obviate the need for such matters to be prosecuted.

■ First, with respect to standing regarding the Titus Fraudulent Transfer Action, the Court has already pointed out when resolving such matter that the Trustee obtains his derivative standing to prosecute the same via § 544(b)(1) because a creditor indisputably existed as of May 20, 2010, that could have prosecuted such matter, not because TRZ in particular was such creditor. Second, with respect to standing to prosecute the only exemption objection that the Court sustains herein, that being the objection to the Debtor's exemption of the $74,412 that is listed on his Bankruptcy Schedule B as an interest in a capital account at the Schnader Law Firm, the Trustee indisputably possesses standing to prosecute such exemption objection without any derivation from TRZ.

Third, even if a claim in the name of TRZ were to be disallowed, that would not serve to negate the need for prosecuting and then resolving the instant matters. The Court so rules because other creditors would still exist with claims that could then be satisfied by any recovery that would be obtained in such matters. Specifically, the Schnader Law Firm itself is presumably such a creditor. As well, if TRZ would not be a creditor of the Debtor, then some other entity related to TRZ indisputably would be such a creditor; such other related entity might potentially share in a distribution of estate property, pursuant to 11 U.S.C. § 726(a)(3), by filing a tardy proof of claim.

■ In any event, the Court shall overrule the objections to TRZ's proofs of claim. The Court so rules because, even if it was the case that an affiliate of TRZ should have been named as creditor in TRZ's proofs of claim rather than TRZ itself, TRZ could easily rectify such error by amending its last proof of claim, timely filed as it was, and such amendment would relate back in time to when such last proof of claim was filed. *See In Unioil, Inc.,* 962 F.2d 988, 992–93 (10th Cir.1992) (" '[w]here . . . [the only change] is a substitution as . . . claimant of one having the legal right to sue instead of one improperly named as . . . claimant and the party substituted bears some relation of interest to the original party, there is no change in the cause of action and the substitution relates back to the . . . filing of the claim' "); *In re Gens,* 112 F.3d 569, 575 (1st Cir.1997) (same). Such an amendment would be proper here because neither the Debtor, the Schnader Law Firm, nor any other unsecured creditor would suffer prejudice by virtue of the allowance of such an amendment. The Court so holds because (a) "something more than mere creditor disappointment is required to preclude amendment," *Gens,* 112 F.3d at 575 (rejecting as prejudice that other creditors simply will receive less in a distribution if a claim amendment is permitted), (b) there would be no risk of multiple liability to both TRZ and an affiliate of TRZ if a claim amendment so as to name such affiliate as claimant were permitted, *see Unioil,* 962 F.2d at 991, and (c) undue surprise would not occur if such an amendment were to occur in the instant case given that the objecting parties herein do not dispute the present existence of the joint and several Lease Litigation judgment, *see Id.*

Because TRZ could so amend its last proof of claim if it needed to, it really matters not for claims allowance purposes whether TRZ is technically the proper entity to whom the Debtor owes the joint and several Lease Litigation judgment, that is whether an affiliate of TRZ should have been named as claimant rather than TRZ itself in such proof of claim. Therefore, the substance of the objections to TRZ's claim are pointless. Consequently, the Court shall overrule such objections. The

Court also concludes that, because it matters not for claims allowance purposes whether TRZ is technically the proper entity to whom the Debtor owes the joint and several Lease Litigation judgment, no need exists to resolve such issue. Consequently, the Court will not resolve the issue of whether an affiliate of TRZ should have been named as creditor in TRZ's proofs of claim rather than TRZ itself.

 Finally, and even though it is of no real significance given that the Court overrules the objections to TRZ's claim on their merits, the Court holds that the Debtor and the Schnader Law Firm lack standing to object to TRZ's claim. The Court so holds given the existence of the Trustee and the fact that the Court has not yet authorized either the Debtor or the Schnader Law Firm to so act in place of the Trustee. *See In re Trusted Net Media Holdings, LLC,* 334 B.R. 470, 474–76 (Bankr.N.D.Ga.2005) ("where a trustee is appointed to administer an estate, a creditor can object to the claim of another creditor only if, upon demand, the trustee refuses to do so and the court grants the creditor the right to act on behalf of the trustee"); *In re Bakke,* 243 B.R. 753, 755–56 (Bankr.D.Ariz.1999) (same); 4 *Collier on Bankruptcy,* ¶ 502.02[2][c] & [d] at 502–13 to 14 (Bender 2011) (same). Given that the Court now rules, as set forth above, that the substance of the objections by the Debtor and the Schnader Law Firm to TRZ's claim are pointless, and since the Court now also actually overrules such objections on their merits, the Court would not authorize either the Debtor or the Schnader Law Firm to prosecute such claim objections as they have proceeded to do in any event.

**IV.** *The impact of Stern v. Marshall on the instant matter.*

Because of the recent decision by the United States Supreme Court in *Stern v.* *Marshall,* —— U.S. ——, 131 S.Ct. 2594, 180 L.Ed.2d 475 (U.S.2011), an issue arises as to whether this Court has the constitutional authority to enter a final decision in a fraudulent transfer action that is brought pursuant to state law by way of § 544(b)(1). *See In re El–Atari,* 2011 WL 5828013 at 3 n. 4 & 4 (E.D.Va.2011); Jonathan P. Friedland, *Stern v. Marshall—The Supreme Court Revisits Marathon,* Commercial Bankruptcy Litigation § 3:4 (2012). In fact, this very issue has been raised by certain similarly situated parties in other adversary proceedings that are presently pending before this Court. As the Court understands it, these litigants argue only that this Court lacks the constitutional authority to enter a final decision in a fraudulent transfer action brought under state law via § 544(b)(1), not that this Court lacks subject matter jurisdiction altogether regarding such an action.

 This Court is inclined to agree with those authorities that construe the *Stern* decision narrowly and hold that, notwithstanding *Stern,* a bankruptcy court possesses the constitutional authority to enter a final decision regarding a fraudulent transfer action that is brought pursuant to state law by way of § 544(b)(1). *See El–Atari,* 2011 WL 5828013 at *3 n. 4 (citing cases). Therefore, this Court concludes that it possesses the constitutional authority to enter a final judgment in the Titus Fraudulent Transfer Action. Also supporting the preceding conclusion by the Court is the fact that the Debtor removed the Titus Fraudulent Transfer Action to this Court; because of such removal, the Debtor arguably consented to have this Court enter a final judgment in the Titus Fraudulent Transfer Action.

 However, the Court also holds that, even if it does not possess such au-

thority, it at least possesses subject matter jurisdiction over such a fraudulent transfer action and, thus, also the constitutional authority to submit proposed findings of fact and conclusions of law to a district court regarding said action. *See In re Canopy Financial, Inc.,* 2011 WL 3911082 at *4–5 (N.D.Ill.2011); *El–Atari,* 2011 WL 5828013 at *3–4. Therefore, the Court concludes that, because it possesses subject matter jurisdiction over the Titus Fraudulent Transfer Action, it thereby is also vested with the constitutional authority to at least propose findings of fact and conclusions of law to a district court regarding such action.

In light of the foregoing, the Court takes the view that the instant Memorandum Opinion (and accompanying Order of Court) constitutes a final judgment to the extent that it pertains to the Titus Fraudulent Transfer Action. However, if a U.S. District Court ultimately disagrees with this Court and determines that, pursuant to *Stern v. Marshall,* this Court may not enter a final judgment in such action, then the portions of this Court's opinion and order that pertain to such action constitute proposed findings of fact and conclusions of law.

### CONCLUSION

For all of the foregoing reasons, the Court will grant judgment in favor of the Trustee, and against the Debtor and Mrs. Titus jointly and severally, in the Titus Fraudulent Transfer Action in the amount of $281,006.18. The Court will also sustain the objection of the Trustee and TRZ to the Debtor's exemption of the $74,412 that is listed on the Debtor's Bankruptcy Schedule B as an interest in a capital account at the Schnader Law Firm. The Court will overrule the remainder of the exemption objections that have been made by the Trustee and TRZ. Finally, the Court will overrule the objections to TRZ's claim that have been made by the Debtor and the Schnader Law Firm.

### ORDER OF COURT

AND NOW, this **29th day** of **February, 2012,** for the reasons, and utilizing the nomenclature, set forth in the accompanying Memorandum Opinion of the same date; it is hereby **ORDERED, ADJUDGED, AND DECREED** that:

(a) judgment is **GRANTED in favor of the Trustee, and against the Debtor and Mrs. Titus jointly and severally,** in the Titus Fraudulent Transfer Action in the amount of $281,006.18; [1]

(b) the objection of the Trustee and TRZ to the Debtor's exemption of the $74,412 that is listed on the Debtor's Bankruptcy Schedule B as an interest in a capital account at the Schnader Law Firm is **SUSTAINED;**

(c) the remainder of the exemption objections that have been made by the Trustee and TRZ are **OVERRULED;** and

(d) the objections of the Debtor and the Schnader Law Firm to the claim of TRZ are **OVERRULED.**

---

1. If it is ultimately determined that, pursuant to *Stern v. Marshall,* this Court may not enter a final judgment in the Titus Fraudulent Transfer Action, then this Court's granting herein of a judgment in favor of the Trustee, and against the Debtor and Mrs. Titus, shall constitute this Court's recommendation (i.e., proposed findings of fact and conclusions of law) regarding such action to the U.S. District Court.